IN THE MATTER OF THE ESTATE OF } JULY TERM, 1851.
RACHEL COLVIN, A LUNATIC.

[LUNACY AND LUNATICS—RECEIVERS—JURISDICTION—ADMINISTRATOR PENDENTE LITE—APPEALS.]

THE authority of the Court of Chancery in this State, to take charge of the estates and persons of idiots and lunatics, is derived from the 6th section of the Act of 1785, ch. 72, which gives the Chancellor full power, in all cases, to superintend, govern, and manage their estates and persons.

The power of appointment of a committee for a lunatic is a discretionary one in the Chancellor, and cannot be reviewed by any other Court, though it should not be exercised arbitrarily or capriciously, and without regard to the wishes or recommendations of those interested in the estate, or who feel an interest in the person of the lunatic.

Though the committee is usually appointed on the nomination of the person who sues out the commission of lunacy, yet a *caveat* may be entered against the appointment, and when this is done, the recommendations of the parties interested will be considered, and proof taken to aid the Court in making the selection.

Though in this State it is more usual to appoint the same party committee of the person and estate, yet not unfrequently the practice is different, and from peculiar circumstances it is sometimes eminently proper to intrust the person of the lunatic to one committee, and his estate to another.

The rule of the Court in making such appointment, other things being equal, is to appoint him who is recommended by the greatest number of those who are entitled to be heard.

The will of a lunatic, though made when she was *compos mentis*, and though she may never be restored to mental capacity so as to revoke it, is still, in legal contemplation, ambulatory until her death, and until then can confer no rights, and can have no influence on the Court in appointing her committee.

The great and leading object in the selection of persons for the management of the estates of lunatics, and the custody of their persons, is to advance their welfare and comfort, and the interests of those who may be entitled to the succession is wholly subordinate to this.

The law now presumes that the nearest of kin to the lunatic will treat him with more affection than strangers to his blood, and hence consanguinity, though it confers no positive title, is now considered a recommendation in the selection of a committee, and a strong ground must be shown before it will be disregarded.

If the person recommended is embarrassed by pecuniary difficulties, and

there is any reasonable ground for apprehending that he would be likely to employ the money which may come to his hands as committee, in his own affairs, it would operate with powerful force against his appointment.

The death of the lunatic determines the office of the committee, and the only power Chancery retains over the committee, as such, is to compel him to account and deliver possession of the property as the Court shall direct.

But the committee is to retain possession and preserve the property until some person shall appear properly authorized to receive it from him; and, in the mean time, if there is reason to apprehend delay in ascertaining who are entitled to the possession, a receiver may be appointed upon application of the parties in interest.

The jurisdiction of Chancery in lunacy remains, after the death of the lunatic, only to the extent and for the purpose of having the necessary accounts taken, and directing the fund or estate to be paid over to the party or parties entitled.

After the death of the lunatic, Chancery will not administer the fund even for the benefit of creditors; they must pursue their remedies before the ordinary jurisdictions; nor will the Court adjudicate questions of right between opposing claimants.

The 23d section of the 4th article of the new Constitution, prohibits the origination of "new business" in the Court of Chancery, after the adoption of that instrument by the people. A cause in lunacy was depending in the Court before, and the lunatic died after, such adoption. A petition was then filed by parties in interest for the appointment of a receiver, upon the ground that there was a contest in the Orphans Court respecting the will of the lunatic, and delay would occur before any one entitled to the estate would appear.

HELD—that it is a question not free from doubt, whether such petition be not *new business* in the sense of the Constitution, though the Chancellor inclines to think that, under the peculiar circumstances of this case, the Court had the power to appoint the receiver for the temporary purpose of holding and preserving the property, until some person entitled to receive it should appear, and passed an order accordingly.

There is no doubt of the authority of this Court to protect the property of an intestate or testator, by appointing a receiver, pending a litigation in the Orphans Court for probate or administration.

The Court in such cases proceeds upon the ground that the property is in danger, because it may get into the hands of persons who have nothing to do with it, and it will not forbear to exercise the power to appoint a receiver, because the Orphans Court *may* provide for the collection of the effects of the deceased by granting letters *pendente lite*.

An administrator *pendente lite* is entitled and bound to collect the effects of the deceased; he may sue for debts due the deceased, and bring ejectment for leasehold estate even against the heir or next of kin; and his powers,

except as to the authority to sell the goods of the deceased, are co-extensive with those of the general administrator.

Chancery has no power to appoint a receiver *after* the grant of letters *pendente lite* by the Orphans Court, and if such receiver has been previously appointed, his powers cease upon the grant of such letters, and he will be discharged and directed to deliver over the property to such administrator.

It has been the usual practice for administrators *pendente lite* to give bonds, and there is no doubt of the legal validity of such bonds.

The general rule is, that an appeal will not lie from a merely practical order of this Court, preparatory to the final hearing, and by which the rights of the parties are not affected.

The Act of 1830, ch. 185, gives by implication an appeal from orders *appointing* receivers, but does not give the right of appeal from orders *discharging* receivers, and the legislature has never, in terms or by any fair implication, given such right. The power of appointing receivers is a high power, never exercised where it is likely to produce irreparable injustice, or where there exists any other safe or expedient remedy.

But if there is any reasonable doubt upon the question of the right of a party in interest to appeal from an order discharging a receiver, and directing him to account and pay over the property, it is clear no such right of appeal exists in the receiver himself.

A receiver has no rights whatever; he is but an officer of the Court; his appointment determines no right, and in no way affects the title of the property; his holding is the holding of the Court for him from whom the possession is taken, and he has no more right to ask for a revision of the order removing him than an entire stranger to the cause.

He is appointed on behalf of all parties, and not of the plaintiff or one defendant only, and when the title to the property has been ascertained, the receiver will be considered the receiver of the party so entitled.

The fact that a receiver has entered an appeal from the order discharging him, and filed an approved appeal bond, will not prevent this Court from enforcing by attachment its order of removal.

Whether an appeal will lie or not in any given case is exclusively a question for the Appellate Court to decide.

[The facts of this case are so fully stated in the several following opinions of the Chancellor, as to require no additional statement.]

THE CHANCELLOR:

Upon the petition of Richard C. Warford, filed on the Equity side of Baltimore County Court, on the 6th of November, 1850, a writ *de lunatico inquirendo*, issued to the Sheriff

of that County, to inquire into the lunacy of the party, and by an inquisition taken on the 5th of December then ensuing, the jury found her to be a lunatic, not enjoying lucid intervals, and that she is not sufficient for the government of herself or her property, and that she has been in the same state from the month of April, 1849; but by what means she became a lunatic, the jurors say they do not know, unless by the visitation of God.

Subsequently, to wit, on the 16th of December, 1850, Elisha Warford and others, being of the next of kin, and heirs-at-law of the lunatic, filed their petition in the cause, in which, while they admit that Rachel Colvin is now of unsound mind, they insist that her mental infirmity goes back to an earlier period than that found by the jury, and object to the inquisition on that account; and they likewise object to the appointment of Richard C. Warford, and his sister Rachel J. Warford, either jointly or severally, as the committee of the estate or person of the lunatic, and pray that one Benjamin H. Ellicott may be appointed committee of the estate, and that he and his wife, Mary Ann Ellicott, may be appointed committee of her person.

After the proceedings had been transferred to this Court, upon the suggestion of Elisha Warford, and those who are associated with him, a petition was filed by Ann Sharp and Thompson Pegg and wife, the said Sharp and Mrs. Pegg being also of the next of kin, and presumptive heirs-at-law of the lunatic, in which, for the reasons stated in their petition, they object to the appointment of any of the persons previously recommended, to take charge of the estate, and urge the appointment of St. George W. Teakle, Esquire, as a person peculiarly qualified, from his long and intimate acquaintance with the lunatic and her estate, to discharge the duties of committee.

By an agreement filed on the 9th of this month, the objections to the confirmation of the inquisition are withdrawn, and it is agreed that it shall be confirmed upon certain terms, and

with reservations having reference to ulterior questions not now necessary to be adverted to.

The question, and the only question now to be considered, respects the person or persons who shall be appointed committee of the person and estate of the lunatic, and this question, though it cannot in any way affect the rights of the parties who may, upon the death of the lunatic, succeed to or be entitled to her estate, has been discussed with an earnestness and ability which show how deep an interest they take in it.

Whatever may be the true origin of the jurisdiction of the Chancery Court in England, over the estates and persons of idiots and lunatics, it is certain that the authority of the Court of Chancery in this State, to take charge of their estates and persons, is now derived from the 6th section of the Act of 1785, ch. 72, which confers upon the Chancellor full power and authority in all cases to superintend, direct, and govern their affairs and concerns, both as to the care of their persons, and management of their estates, and to appoint a committee, trustee or trustees, for such persons, and to make such orders and decrees respecting their persons and estates, as to him may seem proper.

The power of appointment is necessarily a discretionary one, and it is thought cannot be reviewed by any other Court, though it would be manifestly improper for the Chancellor to exercise it arbitrarily or capriciously, and without having any regard to the lunatic, or the wishes or recommendation of those who may be presumed to be interested in the estate, or to feel an interest in his or her person. And accordingly, though it most frequently happens that the committee is appointed on the nomination of the person who sues out the commission of lunacy, a *caveat* may be entered against the person so nominated, and when this is done, the recommendations of the parties interested will be considered, and proof taken to aid the Court in making a selection. This is the established practice, and the propriety of it is apparent.

Though in this State it is more usual to appoint the same person committee of the person and estate, the cases are not

unfrequent, in which the person of the lunatic is intrusted to one committee, and his estate to another; and this practice prevails elsewhere, and is sometimes, from peculiar circumstances, eminently proper. 2 *Story's Eq. Sec.* 1364. In this case, it unfortunately happens that the parties interested in the estate of the lunatic, that is, those who in case of her dying intestate would succeed to it, differ very widely and irreconcilably in regard to the person to whom the management of it should be confided, and it becomes the duty of the Court, therefore, to make a selection from the persons recommended, and in doing so, it must be understood that no imputation is intended to be cast upon the party whose claims to fulfil this office may not prevail. The Court must examine the materials brought before it, as a guide to its discretion, and having done so, and made a selection upon the principle which obtains in this and analogous cases, it would be a forced and unreasonable conclusion, to infer that the party whose pretensions are overlooked, or set aside in favor of another, is deemed by this Court unworthy of its confidence.

Confining our attention to those who would, in case of the death of the lunatic at this time, intestate, be entitled to her estate, it is clear, other things being equal, that the appointment, so far as the property is concerned, should be conferred on Benjamin H. Ellicott, as, conceding that the recommendation of him by Ann Hudutt, has been withdrawn, there will still be found a larger interest uniting in his favor, than of either of the other persons. If a majority of the parties in interest do not concur in his recommendation, a considerable plurality certainly does, and this circumstance unquestionably is entitled to much weight.

Sensible, it is presumed, of the influence of this consideration, the petitioner, Richard C. Warford, brings to the notice of the Court two wills, executed by the lunatic, the first in the year 1845, and the last in the year 1848, by either of which the largest portion of her estate is devised and bequeathed to him; and these wills, it is insisted, are fit to be considered, either as indicative of his interest in the estate, or of the con-

fidence and regard which the lunatic felt for him at the period of their execution.

The introduction of these papers has opened a fruitful subject of inquiry, and has induced the parties to collect a vast mass of evidence touching their validity or invalidity, as testamentary dispositions of property.

It is most certain that these papers cannot be regarded as wills. Miss Colvin, the lunatic, is still living, and though the papers, or either of them, may have been executed when she was *compos mentis*, and she may never be restored to her mental capacity, so as to enable her to revoke them if so disposed, still, in legal contemplation, they are ambulatory until her death, and can confer no rights until then.

To enter at this time into an examination of the circumstances upon which the efficacy of these papers may depend, would be to engage in a duty entirely premature, and out of place; and it occurs to me that it would not be proper, whilst declining to make that examination, to permit these papers to influence the decision of the question now before the Court.

The petitioner, Richard C. Warford, seeks to counteract the effect of the recommendation of Elisha Warford, and those who have united with him in favor of Benjamin H. Ellicott, by showing that, under certain instruments of writing executed by the lunatic, he will, at her death, be entitled to the largest portion of her estate; and thereupon the parties now, in the lifetime of the lunatic, engage in a controversy respecting those papers; and it would, as it appears to me, be the clear duty of the Court to investigate the evidence produced upon this point before it could determine what degree of influence to give these papers. It would be manifestly unjust to suffer them to outweigh, or even weaken the recommendations of the next of kin and presumptive heirs-at-law, without looking into and considering the evidence introduced by them to show, either that the papers never had a legal existence, or if they had, that they were revoked by papers subsequently executed; and thus the Court would find itself engaged in deciding upon the validity or invalidity of a will during the life of the alleged testator.

To avoid a proceeding so unusual and anomalous, there seems no alternative but to confine our attention, in deciding upon this application, exclusively to the rights of the parties as they are defined and ascertained by the law; and thus limiting the inquiry, and it appearing, as before remarked, that the recommendation of Mr. Ellicott decidedly preponderates over those in favor of the other persons, it follows that he should be appointed, unless the parties opposing him have succeeded in showing that he is personally unfit for the trust; the ruling principle being the personal fitness of the person for the office.

With a view to make up my judgment upon this point, I have carefully read all the evidence bearing upon it, and have listened with attention and interest to the elaborate arguments of counsel on the one side and the other, and have arrived at the settled conviction that Mr. Ellicott is a fit and proper person to be clothed with this delicate and important trust. His integrity, his business capacity and habits, stand vindicated by the proof, and I can see nothing in the character of the pursuits in which he is engaged from which it can be fairly inferred or reasonably apprehended that he will not faithfully perform his trust. I fully concur in the principle established in the case of *Eunice Salisbury, a lunatic*, 3 *Johns. Ch. Rep.*, 347, and the other cases which have been cited on the same point, that the great and leading object in the selection of persons for the management of the estates of lunatics, and the care and custody of their persons, is to advance their welfare and comfort; and that the interest of those who may be entitled to the succession is wholly subordinate to this. In fact, the old rule which excluded, as a matter of course, the next of kin of a lunatic from the office of committee of his person, if such next of kin was also his heir-at-law, has been broken down, because, contrary to the presumption which prevailed in barbarous times, the law now supposes that those who stand nearest to the lunatic by the ties of kindred, will treat him with more affection and patient fortitude than strangers to his blood; and hence consanguinity, though it confers no positive title, is now considered as a considerable recommendation in the selection of a

committee, and a strong ground must be shown before it will be disregarded. *In the matter of Mary Livingston, a lunatic*, 1 *Johns. Ch. Rep.*, 436. *Ex parte Cockayne*, 7 *Ves.*, 591. *Ex parte Le Heup*, 18 *Ves.*, 227. If in this case there exists any ground for supposing that Mr. Ellicott, in managing the estate of this unfortunate lady, would consult rather the interests of the persons who may succeed to it upon her death than her comfort and welfare, the Court would undoubtedly give full weight to that consideration. But no such ground appears. On the contrary, forming an opinion on the evidence, there is every reason to believe he will discharge his trust with fidelity, alike to the lunatic and to those who, upon her death, may be entitled to call upon him for an account of his stewardship.

The Court might, in the exercise of its discretion, associate another with him in the trust, but this is not often done ; and there are reasons which frequently, and perhaps in this case especially, render it inexpedient. It has been suggested, and authorities cited to show, that persons embarrassed by pecuniary difficulties, and who, under the pressure of such difficulties, might be tempted to use the money or estate of the lunatic improperly, are not fit to be placed in offices of this description. That such a consideration is entitled to weight, is shown by the case of *Ex parte Proctor*, 1 *Swanston*, 531, 533; and I am free to say, that if I could see in this evidence any reasonable ground for apprehending that Mr. Ellicott would be likely to employ the money which may come to his hands, as committee of this estate, in his own affairs, or for his own benefit, it would operate with powerful force against his appointment. But I can see no such ground in the proof; and besides, the very character of the order of appointment, and the security which will be taken for the performance of the duties of the committee, render any misapplication of the trust estate extremely improbable. The committee, by the terms of the order, is required to return an inventory of the lunatic's estate within six months from the date of the order, and to account for his receipts and expenditures once in each year, and oftener, if required.

Seeing, then, that Mr. Ellicott stands free from any well-founded personal objection, and that while there is no reason to suppose that he will be unmindful of the interest of the lunatic, he is the choice of more of those entitled to the succession than either of the other persons recommended, I consider it my duty to confer the appointment upon him; but in doing so, and in putting aside the claims of the other persons recommended for the office, I am not to be understood as concurring in the imputation of misconduct, and consequent unfitness for the trust, which has been urged against Richard C. Warford, one of them.  Upon that subject I express no opinion, resting my judgment wholly upon what I consider the rule of the Court, other things being equal, to appoint him who is recommended by the greatest number of those who are entitled to be heard.

But whilst I place the property in the hands of Benjamin H. Ellicott, I shall confide the person of the lunatic to the care of Mrs. Mary Ann Ellicott and Miss Rachel J. Warford, her kinswomen.  The evidence shows conclusively, and it has been fully conceded on all hands, that they are peculiarly and eminently deserving of the trust, and that their unfortunate relative will receive from them the kindness and tender regard and solicitude which her afflicting situation requires; and as her fortune is ample, the most liberal allowance for her comfort will be made.

The view which I have taken of this case, relieves me from the necessity of expressing an opinion upon the admissibility of the evidence which has been excepted to.

———

[Afterwards, to wit, on the 5th of February, 1853, a petition was filed in the cause by Joseph Cain and others, stating that they are among the next of kin of said lunatic, and that said lunatic had departed this life having left a will, the probate of which is disputed; that, in the mean time, there is no one to whom Benjamin H. Ellicott, the committee of her estate, can deliver the same, either personal or real, which is, therefore, liable to loss and injury, and praying that a receiver may be appointed to take possession of the estate of said lunatic,

both personal and real, until some one having right to the
same shall appear, to whom it can be delivered, or until further
order of this Court in the premises, and recommending the said
Ellicott as the proper person to be appointed such receiver.
The Chancellor on the same day, but previous to the filing of
this petition, made the following remarks.]

THE CHANCELLOR:

Upon looking more carefully into the question affecting the
authority of the committee, after the death of the lunatic, I am
satisfied that his office is determined by that event; and that
the only power which the Court retains over the committee as
such, is to compel him to account and to deliver possession of
the property, as the Court shall direct. But the committee is
to retain the possession, and preserve the property from in-
jury, until some person shall appear properly authorized to
receive it from him. In the mean time, if there is reason to
apprehend delay in ascertaining who are entitled to the pos-
session, a receiver may be appointed upon the application of
the parties in interest, as was done in the case of the *Duchess
of Norfolk*, cited in *Shelford on Lunacy*, 210.

[Accordingly, on the 9th of February, 1853, the Chancellor
passed an order, appointing the said Ellicott a receiver, " with
full power and authority to take charge and possession of the
estate of the said Rachel Colvin deceased, real, personal, and
mixed, now in the possession of the committee of the said de-
ceased under a former order of this Court, and to hold and
manage the same in all respects as the said committee, during
the continuance of his office and authority, was empowered to
do." The order then requires him to give bond in the penalty
of $30,000 for the faithful performance of his duties as such
receiver. "And power is hereby expressly reserved to this
Court to change, modify, or annul this order, and to discharge
the receiver hereby appointed, and to pass all such orders and
decrees in the premises as may hereafter be deemed neces-
sary and proper." Subsequently to this, Richard C. Warford

was appointed administrator *pendente lite* of the personal estate of the lunatic by the Orphans Court of Baltimore City; and by his petition, filed on the 1st of March, 1853, he prayed that the order of the 9th of February, 1853, might be rescinded, the receiver discharged, and an account taken, &c. Upon the hearing of this petition, the Chancellor delivered the following opinion.]

THE CHANCELLOR:

Upon the petition of certain parties claiming to be interested in the estate of the deceased Rachel Colvin, formerly a lunatic, and whose estate and person were in the care and custody of trustees appointed by this Court, as shown by the proceedings in the cause, an order passed on the 9th of February last, appointing Benjamin H. Ellicott receiver, with certain powers as in the said order are specified and defined. The same party, by an order in lunacy, had been appointed committee of her estate, the Court, for reasons stated on a former occasion, having thought it expedient to commit the care of her person to other parties.

The lunatic is now dead, and there being a contest likely to be protracted, in regard to the validity of a certain paper writing, or writings, purporting to be her will, the Orphans Court of Baltimore City have granted letters of administration *pendente lite* to Richard C. Warford, who has accepted the trust and given an approved bond for the faithful performance of the duties of the office.

The administrator thus appointed and qualified, by his petition filed on the 1st of the present month (March, 1853), prays that the order of the 9th of February may be rescinded, the receiver discharged, and an account taken, to the end that he may be compelled, as committee and receiver, to bring into Court all moneys collected and received by him in both capacities. Upon this petition, an order passed for a hearing, and the questions presented by the petition have been argued by counsel, upon its allegations, the answer thereto, and certain depositions and facts introduced by agreement of parties.

The question first raised, has reference to the constitutional power of the Court to pass the order of the 9th of February, 1853. The new Constitution, which abolishes this Court prospectively, was ratified by the people in June, 1851. By the proviso to the 23d section of article 4, it is provided " That no new business shall originate in the said Court; nor shall any cause be removed to the same from any other Court, from and after the ratification of this Constitution." It is clear, therefore, that if the petition upon which the order in question was passed, can be regarded as new business, in the sense of the Constitution, this Court had no power to entertain it. But if, on the contrary, it may be considered as a proceeding in a cause depending here at the period of the adoption of the Constitution, it was quite competent to the Court to receive and act upon it; because by the section referred to, the powers of the Court with reference to depending causes, are continued to a period which has not yet arrived.

In passing the order of the 9th of February, the question of the Court's power, as affected by the new Constitution, was not adverted to. If it had been, there might perhaps have been more hesitation than was felt at the time ; though I am not now prepared to say, that the petition to have a receiver appointed in this case can be viewed as the commencement of a new suit in this Court. In the first place, the petition was filed, and properly filed in the lunacy cause. It is very true, and not denied that the death of the lunatic put an end to the office of the committee; and that the jurisdiction of the Court in the lunacy cause was determined by the same event, *except* for the purpose of having the necessary accounts taken and directing the fund or estate to be paid over to the party or parties entitled. But to this extent, and for this purpose, the jurisdiction remained. The cause, therefore, was not out of Court. Orders passed in it directing accounts to be taken, or proof to be taken, if necessary, and compelling the committee to pay over the property to the party entitled, would not be *coram non judice.*

The situation of the cause then, was this : the Court had in

the hands of an officer of its appointment, and under its control, this large estate ; that officer, by the death of the lunatic, was *functus officio ;* he could no longer act as committee in receiving rents, collecting money, or performing any act appertaining to his office. The Court could not discharge itself, or the committee, of the possession of the estate, until some one should appear entitled to receive it, and there was reason to believe that some time would elapse before any one so entitled would appear. Under these circumstances, it may certainly be maintained with some degree of plausibility, that an order passed in the same cause, directing the estate to be handed over by one officer of the Court, whose powers were at an end, to another, who could take care of and receive the rents and income of the property, for the benefit of the parties who may be entitled, was not new business within the meaning of the Constitution, but the exercise of the conservative power of the Court, and a duty thrown upon it by the proceedings in the lunacy cause. The order appointing the receiver, determined no question of right, nor did it interfere with any remedy previously open to the parties. No new parties were necessary to be made. It was simply an application to the Court in the cause, then, for certain purposes depending in it, to take the property out of hands powerless for its useful management, and transfer it to another officer, who could not only preserve it from waste and destruction, but who would be at liberty, and required to receive and accumulate its accretion, until some person should appear to whom it could be committed.

It appears to me that it is by no means clear, that such a proceeding for such a temporary and useful object, adopted in a cause actually depending in the Court for some purposes, is the institution of new business within the intent and meaning of the Constitution. In ordinary cases, the appointment of a receiver is ancillary to the main object of the cause. The object is to preserve the property in controversy until the Court shall determine the question of right between the parties. But in this case it never was in the contemplation of the Court, to determine any such question. It was only pro-

posed to hold and preserve the property until some person, whose title had been established elsewhere, should appear and demand it. The Court, says *Mr. Alexander*, in his *Chancery Practice*, after the death of the lunatic "will not administer the fund even for the benefit of creditors;" "they must pursue their remedies before the ordinary jurisdictions;" "nor will the Court adjudicate questions of right between opposing claimants;" and in these views he is fully supported by the authorities here and in England. So here, in the appointment of a receiver, impelled by the exigency of the case as disclosed by the petition, the Court did not mean to invite or entertain a controversy to be carried on in regard to the title to this property. It merely meant to preserve it in safety and intact until, by proceedings before the ordinary jurisdictions, the right to the possession should be ascertained, and upon reference to the terms of the order of the 9th of February, it will be apparent that this was its character.

But without intending to express a decided opinion upon this question, which is certainly not free from doubt, the point next to be considered is the order proper to be passed, now that administration has been granted, and the administrator is here asking to have the personal estate paid over to him, and for an account of it, since it has been held by the committee and receivers.

Nothing can be clearer than that if the estate had remained in the hands of the committee of the lunatic, and full letters of administration, or letters testamentary had been granted to any one, the right of such administrator or executor to the personal estate would have been incontestable. This, of course, is conceded. But it is said the property here is not in the hands of the committee, but in those of a receiver, and this Court having assumed jurisdiction of the cause by the appointment of the latter, no other Court of merely concurrent or co-ordinate jurisdiction can interfere; and the case of *Albert and Wife* vs. *Winn & Ross*, 7 *Gill*, 446, is referred to in support of this position.

This view of the case, however, would give a much more

extensive operation to the order of the 9th of February, and the petition on which it was passed, than was in the contemplation of the Court at the time, or is warranted by the statement and prayer of the petition itself. The prayer, which seems to have been founded upon the remarks of the Court of the 5th of February, is " that a receiver may be appointed to take possession of the estate of the said Rachel, until some one having right to the same shall appear, to whom it can be delivered, or until the further order of the Court. In the case of *Albert and Wife* vs. *Winn & Ross*, this Court, upon a bill first filed here, had possessed itself of the administration of the estate of Jones, and had forbidden, by injunction, the adoption of any measures in any other Court, or *in pais*, by his creditors, for the purpose of securing to themselves preferences in the payment of their claims, and after the injunction had been granted, and whilst it was in full force, Albert and Wife, his creditors, by a proceeding in the Baltimore County Court, on its equity side, attempted to secure to themselves a preference. It was this attempt, in violation of the previous injunction, which by a subsequent order this Court prohibited, which was the subject of contest in the Court of Appeals. And the order of this Court, restraining proceedings in the Baltimore County Court, was placed upon the express ground that by the first bill here, the entire administration of Jones's estate was brought before it for adjudication, and this was the view adopted by the Court of Appeals upon the appeal.

But that case is not at all like the present. Here, from the terms of the petition upon which the order of the 9th of February last was passed, and the language of the order itself, it is manifest it was intended to be provisional and temporary only, being merely designed to preserve the estate until some one properly authorized should appear to claim it, and the right so to claim was to be a question to be inquired into and determined elsewhere. This Court certainly, in passing that order, did not design to take to itself the administration of the estate of the deceased, which would, in my judgment, have

been an unwarrantable usurpation of the jurisdiction of the Orphans Court.

The question, then, is whether the time has now arrived when this Court may *let go its hold* of the personal estate of the deceased, taken into its possession, as we have seen, merely to preserve it from destruction or diminution, and this raises the question of the extent of the authority of the administrator *pendente lite*. There can, I presume, be no doubt of the authority of this Court to protect the property of an intestate or testator, by appointing a receiver pending a litigation in the Ecclesiastical Court for probate or administration. It was assumed by *Lord Eldon* as free from doubt, in the case *King* vs. *King*, 6 *Ves.*, 172, and though apparently to some extent shaken by *Lord Erskine* in *Richards* vs. *Chave*, 12 *Ves.*, 462, it has been fully and firmly established in subsequent cases. See *Edmunds* vs. *Bird*, 1 *Ves. & Bea.*, 542; *Atkinson* vs. *Henshaw*, 2 *Ves. & Bea.*, 85; *Ball* vs. *Oliver*, *ib.*, 96. The Court, in such cases, proceeds upon the ground that the property is in danger, because it may get into the hands of persons who have nothing to do with it; and it will not forbear to appoint a receiver, because the Ecclesiastical Court may provide for the collection of the effects of the deceased by granting letters *pendente lite*. This is the conclusion of the cases refered to, and is asserted to be the rule in 1 *Williams on Executors*, 339, 340 (2 *Am. Ed*).

Having then the power to appoint a receiver, pending the litigation in the Orphans Court for probate or administration, although that Court, by granting administration *pendente lite*, might provide for the collection of the effects, the question remains, will this Court continue the office of receiver after the Orphans Court has actually made such appointment? The ground, as stated by *Lord Eldon* in *King* vs. *King*, upon which the Court proceeds in appointing the receiver pending the litigation in the Ecclesiastical Court is, "that the property is in danger in this sense, that it may get into the hands of persons who have nothing to do with it." But this observation is, of course, inapplicable to the case of an administrator *pen-*

*dente lite.* He is unquestionably entitled, and is bound to collect and to possess himself of the effects of the deceased, it being now settled, whatever doubts may formerly have been entertained, that he may maintain suits for debts due the deceased, and bring ejectment for leasehold estate against the heirs or next of kin, or any other person who may be in possession of it. 1 *Williams's Executors,* 313. And in the *Deputy Commissary's Guide,* 56, 57, the powers of these temporary administrators, with the exception of the authority of selling the goods of the deceased, are said to be co-extensive in all respects with the general administrator. However this may be, there can be no doubt of his authority and duty to possess himself of the personal property of the deceased, and to bring suit to recover it, if any one, even the heir-at-law or next of kin, withhold it from him. It certainly cannot be said of a person clothed with such powers and burdened with such duties, that he is a person who has nothing to do with the personal estate of the deceased, and that to prevent it from falling into his hands, this Court should interpose by putting in a receiver.

All the cases cited by the counsel for the receiver, except that of *Atkinson* vs. *Henshaw,* 2 *Ves. & Bea.,* 86, strongly imply that though the power of the Court of Probate to grant letters *pendente lite* would not oust the Court of Chancery of the authority to appoint a receiver, to preserve the property pending the litigation, yet the actual grant of such letters would have that effect by removing the necessity for such appointment. But *Lord Eldon,* in *Atkinson* vs. *Henshaw,* speaking of the effect of the decision in *Walker* vs. *Woollaston,* 2 *Peere Wms.,* 576, that an administrator *pendente lite* might maintain an action to recover the possession of the personal effects of the deceased, and after maintaining that such a right in the temporary administrator did not deprive chancery of the jurisdiction to appoint a receiver *pendente lite,* intimates a doubt whether the actual appointment of such administrator would obviate the necessity for a receiver. It will be seen, however, that it is a mere doubt. The case before him was

one in which administration *pendente lite* had not been granted, and as was said by him in the same paragraph in which the doubt is expressed, "much destruction of property may take place *before* the appointment of such administrator."

But no case has been nor I believe can be produced, in which this Court has appointed a receiver *after* the grant of letters *pendente lite* by the Ecclesiastical Court, and the power of this Court to act in such a case rests entirely, so far as I am informed, upon the doubt thrown out by *Lord Eldon* in the case referred to. The effect of this doubt, moreover, is much weakened, if not entirely overthrown, by the case of *Rendall* vs. *Rendall*, 23 *Eng. Ch. Rep.*, 152, in which the Vice-Chancellor decided, that a receiver will not be appointed pending a litigation to recall probate or grant of administration, unless a special case can be made out for such appointment, adopting in the conclusion of his judgment the language of *Lord Cottenham*, that "there is no doubt that by the rule of this Court, if the representation is in contest, and no person has been constituted executor, the Court interferes, *not because of the contest*, but *because there is no proper person to receive the assets.*" If, therefore, there be a proper person to receive the assets, the litigation in the Orphans Court is immaterial. The Court on that account will not interfere. These observations are strong against the prolongation of the powers of the receiver, because none can doubt that an administrator *pendente lite* is a proper person to receive the assets. His authority in this respect is as complete as that of the general administrator.

Upon the grant of full letters of administration or letters testamentary, the powers of the receiver would of course cease, because then the litigation in the Orphans Court would be at an end, and to keep the property here would be to strip the latter Court of its acknowledged jurisdiction over the personal estates of deceased persons. But why should not the same result follow upon the grant of temporary letters? The limitations upon the power of such an administrator, as defined by *Mr. Williams* in his treatise *on executors*, before referred to,

are certainly not of a character to render it necessary to continue the office of receiver. Even with those limitations his authority is more ample than the authority of the receiver, who cannot sue unless specially authorized by the Court to do so. And if the definition of the power of an administrator *pendente lite*, as given in the Commissary's Guide, is the true one, then the reason for discontinuing the office of receiver upon the grant of such letters · is still more obvious. This Court, it is presumed, would scarcely undertake to prohibit by injunction the grant of temporary administration by the Orphans Court after a receiver had been appointed here, and yet it would seem to be proper to do so, if after such grant the Court, through its receiver, will withhold the personal property of the deceased from the administrator. It appears to me to be clear that when the necessity for the office of a receiver ceases, the office must cease, and that it would be a dangerous invasion by this Court of the jurisdiction of the Orphans Court, to retain the property of the deceased here, when that Court had appointed an officer with competent powers to take possession of it.

It is not, of course, pretended that this Court, or any Court, in a collateral proceeding, can review or revise the judgment of the Orphans Court, in granting the letters in question. Their power to grant such letters cannot be questioned since the Act of 1810, ch. 34, if it did not exist before; and by the 6th section of that act full discretion is given to make the grant to either of the three classes of persons therein mentioned, and it is not denied, that the person to whom the grant was made in this case falls within one or more of the classes, assuming, as is proper, that the will propounded for probate is the contested will.

But it is said that an administrator *pendente lite* is not required to give bond, and this is urged as a reason why the property should not be allowed to go into his hands, though, in point of fact, he has given a bond which has been approved by the Orphans Court. In the *Commissary's Guide*, 57, speaking of the duty of such temporary administrator to account

with the executor, or full administrator, when the contest is determined, and the power of the latter is complete to call on him for such account, the author says, "in case of maladministration, the temporary administrator may be cited before the Commissary-General, or his bond may be put in suit," and at page 190 the form of the bond is given. Upon this authority, and the universal practice and fitness of the thing, I should entertain no doubt of the necessity of a bond in such cases, and of the validity of the bond; but in addition to it, we have the case of *State* vs. *Craddock*, 7 *H . & J.*, 40, in which, though the suit on the bond was not maintained, its legal validity was assumed in the clearest terms.

I am, therefore, of opinion, that so far as the personal estate of the deceased is concerned, the receiver must be discharged, the accounts taken separately, whilst he held it in that capacity and as committee of the lunatic, and the property itself, and its accumulations, be delivered over to the administrator *pendente lite*. And the only remaining question is, shall the receiver be continued with reference to the real estate?

Two or three considerations induce me to answer this question in the negative, and have brought my mind to the conclusion that he should be discharged as to the real estate also. As has been already stated, the constitutional power of this Court to entertain the petition for the appointment of a receiver, and to pass the order of the 9th of February last, has been seriously questioned; and though, for the reasons before mentioned, I am inclined to think that, under the peculiar circumstances of the case at that time, and to the extent and for the purpose contemplated by that order, the Court did possess the power to pass it, I am yet free to admit that it is a question upon which grave doubts may exist, and the very existence of such doubts would incline the Court to forbear to exert the disputed power, unless some urgent necessity for so doing existed. Such necessity appeared to exist at that time, but does not now, because the parties interested are aware of the condition of the estate, as shown by the proceedings in the cause since the date of the order; and it is not to be doubted, if this

Court relinquishes the possession of the property, they will be prompt in applying to some Court competent to protect it from injury.

The order of the 9th of February, moreover, was passed *ex parte*, and necessarily so, because of the perils to which this large estate would have been exposed by the delay of giving notice to the parties in interest. But these parties are now here, some claiming to be heirs-at-law, and others devisees under a paper purporting to be the will of the deceased, and insisting that the receiver appointed by the order in question shall be removed, and others appointed in his place.

It is also a circumstance not unworthy of consideration, that the constitutional existence of this Court is limited to a period now rapidly approaching, and in all human probability, that period will have arrived and passed long before the controversy in regard to the will can be brought to a close. It is certainly far better that this valuable estate should be under the care and control of a permanent Court than of one which must cease to exist in a short time. As by the appointment of a receiver no question of right was decided, so by his discharge none will be touched; but the receiver, and those of the parties who desire him to fill that office, will be at liberty to go before the proper tribunal and ask for his appointment. No harm is done to any one by requiring him to settle his accounts, and to hand the property over to those who may be entitled to its possession. An order will be passed in conformity with these views.

———

[The Chancellor accordingly, on the 19th of April, 1853, passed an order discharging the receiver, and directing him to account, as stated in the above opinion. From this order the receiver entered an appeal, and filed an appeal bond. A motion was then made by the administrator *pendente lite*, for an attachment to compel the receiver to comply with the order of the 19th of April. Upon the hearing of this motion, the Chancellor delivered the following opinion, on the 17th of May, 1853.]

THE CHANCELLOR:

This is an application to enforce, by attachment, the order of the 19th April last, by which Benjamin H. Ellicott was removed from the office of receiver, to which he was appointed under a previous order of this Court, and directed to account and deliver to Richard C. Warford, administrator *pendente lite* of the deceased, the personal estate and effects in his hands; and the only questions which properly arise upon this application, are two. *First,* can the receiver appeal from the order? and *secondly,* if he cannot, will this Court, notwithstanding he has entered and filed an approved appeal bond, proceed to enforce its execution? In addition to these, however, the counsel have argued a *third,* and that is, whether an appeal will lie from the order in question, in behalf of any of the parties in interest? and upon each of these I propose very briefly to express an opinion.

It is conceded, that if the right of appeal exists, it is not in virtue of any statutory enactment expressly giving it. If it exists at all, the right is founded either upon general principles regulating the subject of appeals, or is derived, by implication, from some one of the various Acts of Assembly which have been passed from time to time, or is to be drawn from the general scope and spirit embodied in them as a whole.

The general rule undoubtedly is, that an appeal will not lie from a mere practical order of this Court, preparatory to the final hearing, and by which the rights of the parties are not affected. Such was announced to be the law in the case of *Thompson* vs. *M'Kim*, 6 *H. & J.*, 312, and is asserted in every subsequent case in which the subject has been spoken of in the Court of Appeals.

Now it cannot be said that an order appointing a receiver, or discharging him, has, or can have, any influence upon the rights of the parties. The late Chancellor, in 1 *Bland*, 421, laid down the rule upon the subject in the clearest terms, and the Court of Appeals, in *Ellicott* vs. *The United States Ins. Co.*, 7 *Gill.* 307, repeat and adopt his language.

It is true, that by the proviso to the 1st section of the Act

of 1830, ch. 185, an appeal by implication is given from orders appointing receivers, and appeals have been entertained from orders of that description, *Speights* vs. *Peters*, 9 *Gill*, 472 ; but as before said, the legislature has not yet extended it to orders discharging them. It is urged that the policy which dictated the Act of 1830, extends to orders of the kind now under consideration, and that the Courts should by construction enlarge the Act, so as to embrace them. But it appears to me that, independent of the obvious difference between an order which takes property out of the hands of its possessor, and leaves it in the hands of an officer of this Court, and one which restores it, or by which the Court surrenders its possession, the rule of construction contended for is a vicious one.

Assuming that the legislature, by the Act of 1830, designed to enlarge the right of appeal, and extend it to orders appointing receivers, is it legitimate to suppose they did not go so far as they intended to go ? The subject of receivers was before them, and when they stopped short of the point now under consideration, that is, did not give the right of appeal from orders discharging receivers, it must be presumed they did not mean to do so. There are few powers exercised by the Court of Chancery which require greater caution than that of appointing receivers. It is, say the Court of Appeals, in the case of *Speights* vs. *Peters*, " a high power, never exercised where it is likely to produce irreparable injustice, or where there exists any other safe or expedient remedy." And it may well be that the legislature deemed it proper to provide for the revision of the exercise of this high power by a superior tribunal, when they did not choose to give an appeal, either when the Court of Chancery refused to exert the power, or having once exerted it, withdrew its authority by rescinding its order. However this may be, it is clear they have not in terms, or by any fair implication, given the right of appeal from an order like the one in question, and it would be legislation and not construction in the Courts to do it.

But if there could be a reasonable doubt upon the question, of the right of a party in interest to appeal from the order of

the 19th of April last, is it possible to conclude that such right exists on the part of the receiver himself? What is he? His character and functions are well defined by the late Chancellor, in *Williamson* vs. *Wilson*, 1 *Bland*, 421. He is declared to be "an officer of the Court." "He is truly and properly the hand of the Court, but his appointment determines no right, nor does it affect the title of the property in any way; it will not prevent the running of the statute of limitations." "The holding of the receiver, is the holding of the Court for him from whom the possession was taken." In *Ellicott* vs. *The Insurance Co.*, this definition of the office of a receiver is quoted with approbation by the Court of Appeals, and hence it is clear that he has no rights whatever, and has no more authority to ask for a revision of the order removing him, than an entire stranger to the cause.

But it is said, that though he cannot complain of the order removing him, yet as this order goes further, and directs him to deliver over property to the administrator *pendente lite*, he may, on that account, be entitled to take the judgment of the Appellate Court. But what is it to him what the Court does with the property, provided he is discharged from his responsibility as receiver? And that he would be so discharged by obeying the order of the Court, cannot be questioned. It is, moreover, conceded that the receiver has no rights himself, and of course cannot appeal or interfere in any way in the conduct of the cause, unless he can be considered as representing those at whose instance he was appointed. But to view him in that light, would be to give him a character inconsistent with the nature of his office, as defined by Chancellor Bland. How can he be the officer of the Court, and the hand of the Court, and at the same time the representative of the interests of certain of the parties to the cause? The Court must act by its officers and agents, and there is as much propriety in calling the Court the representative of any of the parties to the cause, as its agents and officers, who derive their authority from the Court, and are removable at its discretion.

If, however, there could be a doubt upon the subject, it

would be removed by the passage from 5 *Lib. of Law & Eq.*, 435, quoted and adopted in the case of *Ellicott* vs. *The Insurance Co.*, which proves that a receiver is appointed on behalf of all parties and not of the plaintiff, or of one defendant only, and that when the title to the property has been ascertained, the receiver will be considered as his receiver. Surely it would be attended with dangerous consequences to allow parties in interest to stand back and shun personal responsibility for costs and damages, whilst the receiver, instigated by them, carried on controversies with other parties to the cause. If the receiver may prosecute this appeal on behalf of the parties whom he may be supposed to represent, why may he not interfere at any and every stage of the cause, when he may think the interests of those parties require it? But surely this could never be tolerated. The proceedings in the cause, except, indeed, where his own accounts and allowances are concerned, are as to him *res inter alios acta*, as was decided in regard to a trustee appointed by the Court to sell property and pay debts, in the case of *State use of Oyster* vs. *Annan*, 1 *G. & J.*, 450.

I hold it, therefore, to be too clear for doubt, that a receiver has no right to intermeddle in questions affecting the rights of the parties or the disposition of the property in his hands; that he cannot in any sense, or to any extent be regarded as the representative of any one or more of the parties to the cause, and that he must retire from his office, and give up the property committed to his custody, whenever required so to do by the Court; and this, whether the power to discharge him was reserved or not, as was correctly stated in the argument. In this case, the power was expressly reserved, not because it was deemed necessary, but to indicate plainly to all parties that the order of the 9th of February last was to be regarded as temporary only, and only passed in view of the peculiar exigencies of the case.

The only remaining question is, will the Court, notwithstanding the appeal of the receiver and the bond given by him, execute the order appealed from? Why not? How can his rights be

affected one way or the other by the execution of the order, no matter what may be the decision of the Court of Appeals? It is not necessary to inquire into the origin of the practice of filing appeal bonds, to stay proceedings on the decrees or orders of the Court of Chancery pending the appeal, which was supposed by the Court of Appeals, in *Thompson* vs. *M'Kim*, to have been adopted by analogy to the provisions of the second section of the Act of 1713, ch. 4. The law. upon the subject is now settled by the Act of 1826, ch. 200, sec. 1, which declares "that no execution upon any judgment or decree in any County Court, or other inferior Court, or Court of Chancery, shall be stayed or delayed, unless the person or persons against whom such judgment or decree shall be rendered or passed, his, her, or their heirs, executors, or administrators, or some other person or persons on their behalf, shall enter bond," &c. Now, can it with propriety be said that the receiver in this case is a person *against* whom a judgment or decree has been passed, or does the order touch his rights? Confessedly not, for he has no rights. He is simply removed from an office, which certainly was not conferred upon him for his own benefit, and he is required to deliver up and account for property to which it is conceded on all hands he has no shadow of title. The question then is, not whether this Court, or the Appellate Court is to decide whether an appeal will lie or not, in any given case. It has been settled by the case of *Oliver* vs. *Palmer & Hamilton*, 11 *G. & J.*, 137, that this is a question exclusively for the Court of Appeals. But the question here is, whether the order of this Court shall be stayed, because a party outside of the cause, who has no rights, and consequently against whose rights no order or decree has been or could be passed, thinks proper to pray an appeal and give bond? As well might it be said that the Register of this Court, when ordered to draw a check for money paid into Court to the credit of a cause, could stay the execution of the order, by appealing and giving bond. It appears to me impossible to maintain such a proposition. If the Court can be thus embarrassed and delayed by its officers and agents, it

would be rendered powerless for good, and prolific only of inconvenience and mischief.

In the answer of the receiver, filed on the 14th inst., he says distinctly that he has no interest in the estate, and therefore no disposition which can be made of it can in any way concern him. I therefore consider it my duty to enforce obedience to the order of the 19th of April, 1853 ; but inasmuch as the receiver disclaims expressly in his answer any intention to disregard the authority of this Court, or to treat its orders with contempt, I am not disposed, at once, to direct an attachment to issue against him, but will pass an order which will enable him, by yielding promptly to the authority of the Court, to protect himself against the consequences of that process.

———

[An order was accordingly passed on the same day, (17th of May, 1853,) requiring the receiver to comply with the order of the 19th of April, 1853, "by yielding up and delivering to the said Richard Colvin Warford, administrator *pendente lite* of Rachel Colvin, deceased, the personal estate and effects of said deceased in his hands; and that as soon as may be conveniently practicable, he make report and account, as required by said order, and in all things execute and obey the same. And it is further ordered, that if the said Ellicott shall neglect or refuse to execute and perform said order, by yielding up and delivering to the said Richard Colvin Warford the personal estate and effects of said deceased, for the period of ten days after the service upon him of a copy of this order, that, upon proof of service and neglect or refusal, the writ of attachment will issue to compel obedience thereto."]

———

GRAFTON L. DULANY, and HENRY WINTER DAVIS, for the Receiver.

WM. SCHLEY, REVERDY JOHNSON, and FREDERICK W. BRUNE, for the Administrator *pendente lite.*