KELLY, SUBSTITUTE COMMITTEE *v.* SCOTT ET AL.

[No. 47, September Term, 1957.]

*Decided January 15, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND and PRESCOTT, JJ.

*D. Heyward Hamilton, Jr.,* and *John S. Stanley,* with whom were *Hershey, Donaldson, Williams & Stanley* on the brief, for the appellant.

*Walter C. Mylander, Jr.,* with whom were *Douglas H. Gordon* and *Marshall A. Binder* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal by the substitute committee of the estate of Thomas Alexander Scott, an incompetent, is from an order of the Circuit Court for Baltimore County, in equity, allowing Virginia Scott, the infant granddaughter of the incompetent, the sum of $125.00 a month for her maintenance and support. The appellant challenges the power of the court to

make the allowance, in the absence of express statutory authority, and also contends that the court erred in making an allowance under the undisputed facts.

The incompetent was married in 1915 and two children were born of the marriage, Miriam Douglas Scott in 1916, and Wilmer Scott in 1918. The incompetent and his wife were separated in 1934 and subsequently divorced. Certain trust instruments were executed in 1931, and again in 1934, whereby trust funds would, at the death of the survivor of the grantor and his wife, pass to their children and descendants. His wife subsequently remarried. The incompetent was found to be a lunatic upon an inquisition returned by a sheriff's jury in 1936, and confirmed by the court, and he was committed to the Sheppard and Enoch Pratt Hospital where he has remained ever since. He is now sixty-three years of age, and incurably insane. There is surplus income in his estate far in excess of what is needed to provide for his support and the costs of administration.

The son, Wilmer, married for the second time in 1943, and in 1946 a daughter, Virginia Scott, was born of the marriage. In 1948 he made an assignment to his daughter of one-half of all the property that may "grow due" to him from his father's estate. His wife divorced him in 1948, and the court ordered him to pay $150.00 a month for Virginia's support. This former wife, the mother of Virginia, then married Mr. Lichtenstein, whose salary is $15,000.00 a year. Virginia, now eleven years old, lives with her mother and stepfather, who has wholly supported her since 1953, and is willing to do so, although he would welcome assistance in the expense of her support and education. Wilmer Scott has two infant children by his fourth wife, with whom he is now living. He earns a modest salary, is heavily in debt, and for several years has failed to pay the support money for Virginia in compliance with the court order. The incompetent's daughter, Miriam, is married to a Commander in the Navy and has three infant children. It appears that the committee, by order of court, has been paying the sum of $150.00 per month to each of the children of the incompetent, Wilmer and Miriam, not only during their minority,

but down to the present date. No question as to the propriety of these payments is raised in this proceeding. The surplus income of the estate was about $10,000.00 in 1955, and $8,000.00 in 1956.

The appellee concedes that there is no legal liability upon the incompetent to support his grandchild, Virginia, who was never a member of his household and of whose existence he is probably unaware. If applicable, Code (1951) Art. 72A, sec. 1, places the obligation upon the father and mother. She contends, however, that there is a basic equitable doctrine that an equity court may substitute its judgment, after an adjudication, to do that which the incompetent might reasonably have done himself, if sane. The doctrine stems from the English case of *Ex parte Whitbread,* 2 Merivale 99 (1816). There Lord Eldon confirmed an allowance to the brothers and sisters of an incompetent whom he was not legally bound to support, and announced the broad principle that "the Court will not refuse to do, for the benefit of the Lunatic, that which it is probable the Lunatic himself would have done." In a footnote to this case it is stated that the earliest precedent for such action was in an order by Lord Thurlow in *Matter of Cotton.* The case is unreported, but must have been decided between the years 1778 and 1792, when Lord Thurlow occupied the office of Lord Chancellor. In 1 *Collinson on Idiots* (1812), p. 245, it was said that the Chancellor could not direct a specific allowance for the support of relatives dependent upon a lunatic, and for whom he provided when of sound mind, although not legally bound to do so, but that their expenses might be included in the general charges of the establishment. Subsequent English cases, between 1816 and the adoption of a statute on the subject, applied Lord Eldon's rule in some cases. See 21 *Halsbury's Laws of England* (2nd Ed.), p. 332; *Shelford on Lunacy, Law Library,* Vol. II (1833), p. 100.

The rule has been recognized or adopted in some of the American states. See Notes, 59 A. L. R. 653, and 160 A. L. R. 1435. See also Notes in 8 Harv. L. Rev. 472; 41 Harv. L. Rev. 402; 54 Harv. L. Rev. 143; 2 Va. L. Rev. 204; 17 Calif. L. Rev. 175; 14 Cornell L. Q. 89. Most of

these commentators stress the desirability of a broad rule, based upon what a reasonable man of means might be expected to do, rather than confining the rule to cases where the incompetent had shown an interest in the beneficiary while sane, or the probability of his action can be shown. In most of the cases noted, however, there were statutes dealing with the subject, although there are general statements as to the inherent jurisdiction in equity. *In re Hudelson's Estate,* 115 P. 2d 805 (Cal.); *In re Schley,* 107 N. Y. S. 2d 884 (Cf. *Whitney v. Harrison,* 127 N. Y. S. 2d 227); *In re Flagler,* 162 N. E. 471 (N. Y.); *In re Buckley's Estate,* 47 N. W. 2d 33 (Mich.); *In re Beilstein's Estate,* 62 N. E. 2d 202 (Ohio App.)—reversed 62 N. E. 2d 205; *Tate v. Tate,* 227 S. W. 2d 50 (Tenn.). Cf. *Binney v. Rhode Island Hospital Trust Co.,* 110 A. 615 (R. I.); *In the Matter of Brown,* 4 Duer 613 (N. Y.); and Note, 1 L. R. A., p. 610. In some cases the allowance has been treated as a gift, in others as an advancement. The dangers of abuse are also stressed in some of the cases. The question seems to be one of first impression in this State.

The difficulty of adopting such a rule in Maryland is that the Maryland cases strongly imply that there is no inherent jurisdiction in equity to make such an allowance. It is true that the equity courts have all the power and authority which the Court of Chancery formerly had, under Code (1951), Art. 16, sec. 102. But, historically, the English Court of Chancery was not clothed with authority over the person or property of an incompetent. This power resided in the King as an executive function or prerogative, on the theory of *parens patriae,* and was delegated to the Lord Chancellor as his personal representative by means of an official instrument called the "Sign Manual". "With respect to lunatics the Statute of 17 Edw. II, ch. 10, enacted that the King should provide that their lands and tenements should be kept without waste. It conferred merely a power, which could not be considered as included within the general jurisdiction antecedently conferred on the Court of Chancery, and therefore a separate and special commission became necessary for the delegation of this new power. * * * After this

special jurisdiction \* \* \* had been exercised in any particular case by adjudging an individual to be a lunatic, and by appointing a committee of his person and property, a further jurisdiction then arose in the Court of Chancery to supervise and control the official conduct of the committee." *Hamilton v. Traber,* 78 Md. 26, 30, quoted in the recent case of *Matter of Easton,* 214 Md. 176, 180. See also *Schneider v. Davis,* 194 Md. 316, 321; 4 *Pomeroy, Equity Jurisprudence* (5th Ed.), sec. 1311; 3 *Story, Equity Jurisprudence* (14th Ed.), sec. 1785, *et seq.* This "further jurisdiction" did not, however, confer any power upon the committee or the court to make a sale for purposes of reinvestment or for the support of the incompetent, as the cases demonstrate.

The statute of Edward II, *De Praerogativa Regis,* was one of the statutes adopted in Maryland under Art. 5 of the Declaration of Rights. It provided, in effect, that under the King's custodianship, the lands and tenements of lunatics should be "safely kept without Waste and Destruction, and that they and their Household shall live and be maintained competently with the Profits of the same." The declared purposes of the statute were to prevent alienation of the property, and to insure its return to the incompetent if he should recover, or to his heirs if he should die insane. 1 *Coe, Alexander's British Statutes* (1912 Ed.), p. 220. For present purposes, it is immaterial whether the statute was declaratory of the common law, or not, as some authorities contend. It did not authorize the expenditure of surplus income for the benefit of persons other than the lunatic and his household.

There appears to be no English precedent prior to the Revolution of 1776, to support the allowance made in the instant case. In the obscurity which the passage of time has cast over the precise state of the law on this subject at the time of the Revolution, and in view of some not entirely harmonious expressions in earlier Maryland cases (*Corrie's Case,* 2 Bland 488, and *Dorney's Estate,* 59 Md. 67), there may be some uncertainty as to just what powers were vested in the Court of Chancery at that time. However, it was stated in *Matter of Colvin,* 3 Md. Ch. 278, 282: "What-

ever may be the true origin of the jurisdiction of the Chancery Court in England, over the estates and persons of idiots and lunatics, it is certain that the authority of the Court of Chancery in this State, to take charge of their estates and persons, is now derived from the 6th section of the Act of 1785, ch. 72 * * * ." This section then and now provides: "The court shall have full power and authority, in all cases, to superintend and direct the affairs of persons *non compotes mentis*, both as to the care of their persons and the management of their estates, and may appoint a committee, or a trustee or trustees for such persons, and may make such orders and decrees respecting their persons and estates as to the court may seem proper." Accordingly, it would seem that the power of a Maryland equity court as to allowances to others than the incompetent, out of surplus income from his estate, would have been limited by the statute of Edward II to the support of his household.

It has been said that this section confers broad and discretionary powers. *Jenifer v. Kincaid*, 191 Md. 120, 128. But in that case the holding was simply that the court might appoint a trustee, other than the committee, for the limited purpose of inquiring into certain conveyances allegedly obtained from the incompetent by fraud. Certainly the language of sec. 132 does not show a legislative intent to confer a power wider than that conferred by the statute of Edward II.

We also regard the enactment of Code (1951), Art. 16, sec. 135, by Chapter 518, Acts of 1929, as significant. In dealing with that section in *Matter of Easton, supra* (p. 185), we held that section 135 created "an alternative and additional method of determining the *factum* of mental incompetency." Cf. *Adams v. May*, 196 Md. 152. We stressed the fact that it was designated to follow section 132 in the Code, and used the word "also" in conferring a power "to appoint a Committee or Trustee to take charge of and manage the property of any person incompetent by reason of a mental disability", which was said to have the same meaning as *"non compotes mentis"* in section 132. In the amendment by Chapter 31, Acts of 1933, the power of "such Committee or Trustee" to "care for and manage the property of

the incompetent and * * * upon proper order of Court expend cash for the incompetent's support and maintenance" was expanded to permit expenditure "for the support and maintenance of the incompetent's dependents." Reading the sections together, it may well be that the power is conferred upon any committee or trustee, whether appointed after a determination of insanity under the alternative method or any other method (the use of a sheriff's jury was abolished by section 134, as enacted by Ch. 751, Acts of 1947). In any event, the appellee cannot prevail, since the grandchild of the incompetent cannot claim as a dependent under the facts of the instant case.

We think the enactment of the amendment to sec. 135 indicates a legislative belief that there was no inherent power in the court to support and maintain dependents, for if there were, the enactment would have been wholly unnecessary. In terms, it is a grant of power. But if it did not grant the power, it can hardly be denied that it limited it. In setting up an alternative method of adjudication, in addition to the older method, which has itself been modified, the legislature has indicated its view as to the limits of the power of disposition. It would create an anomalous situation if we were to now hold that a wider power existed in cases under the old practice as to adjudication.

Since we find no statutory or other authority for the passage of the order appealed from, it is unnecessary to discuss the question as to the propriety of the allowance under the facts of the instant case. No doubt, there is force in the suggestion that the equity courts in Maryland ought to have power to deal with the disposal of the surplus income of an incompetent, comparable to that exercised by the courts in other jurisdictions, particularly in hardship cases. But we think that is a problem for the Legislature.

*Order reversed, costs to be paid out of the estate of the incompetent.*