EVA JACKSON BLISS, by Her Next Friend, Sallie F. Jackson, and VIVIA G. HOLMES.

*vs.*

ALONZO O. BLISS and R. A. BENNETT, Committee of Eva Jackson Bliss.

*Record*: transmission of—; delay.  *Lunatics*: jurisdiction of
equity; notice; appeals, from order of court; time for—.
Husband and wife: costs for insane wife.

Where it appears from the affidavits that the Clerk of the Circuit Court completed the record in time and that the same was duly paid for by the appellant, the latter can not be held responsible for the failure of the record to reach the Court of Appeals within the required time; if the delay is chargeable to anyone other than the express company, it must be to the neglect of the clerk where he appears to have held the record some time after it was completed and paid for before depositing it in the express office.                          p. 68

The judges of the circuit courts have, in their respective circuits, all the power and jurisdiction of courts of chancery, except as modified by the statutes (Code, section 85, Article 16), to issue writs *de lunatico inquirendo;* and as such jurisdiction is exercised for the protection of the community and the protection of the person and property of the alleged lunatic, there is no reason why it should be confined to cases in which the unfortunate persons are residents of, and have property in, the State.                          p. 73

The leading object and chief concern of the courts in the selection of the persons for the management of the estate of lunatics and the care and the custody of their persons is to advance their welfare and comfort.                    pp. 71-72

It is their presence within the limits of the State that necessitates the exercise of this power to protect their persons and the community, and the jurisdiction of the court does not depend upon whether such persons also have property within the State.
                    p. 73

Section 114 of Article 16 of the Code authorizes the court to make such orders and decrees respecting the person and estate of a lunatic as to the court may seem proper.        p. 73

It is a husband's duty to support his insane wife, and it is only when he is unable to do so that resort can be had for maintenance from her separate estate.                    p. 74

Statutes preserving to the wife the ownership and enjoyment of her property do not relieve the husband of his common law obligation to maintain her and to pay for her medical and funeral expenses.                    p. 74

In general, a party proceeded against for an inquisition in lunacy must be given timely notice of the proceedings and an opportunity to contest before the jury the allegations of the petition.                    p. 75

A demurrer was filed to a petition for the appointment of a committee for the person and property of an alleged lunatic, on the ground that the lunatic was a non-resident and possessed no property within the State; the demurrer raised no question of notice; the demurrer was sustained; *held,* that the lunatic under whose name the petition was filed, was not under the restriction of section 37 of Article 5 of the Code, as to objections to jurisdiction.                    pp. 69, 75

*Decided June 19th, 1918.*

The facts are stated in the opinion of the Court.

Appeal from the Circuit Court for Prince George's County. (In Equity.)   (BEALL, J.)

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE and CONSTABLE, JJ.

*Eugene A. Jones,* for the appellants.

*Ogle Marbury* and *George P. Hoover,* for the appellees.

THOMAS, J., delivered the opinion of the Court.

On the 7th of September, 1917, Alonzo O. Bliss filed in the Circuit Court for Prince George's County a petition alleging that his wife, Eva Jackson Bliss, was, and had been "for sometime past," of unsound mind and incapable of the government of herself. or the management of her estate; that she had "little property" and was dependent upon the petitioner "for her support and livelihood," and that it was necessary for her protection that a suitable committee be appointed for her person and estate; that she was then undergoing treatment at the Laurel Sanitarium, near Laurel, in Prince George's County, Maryland; that the petitioner was informed by her physicians that it was "important and essential to her welfare" that she be allowed "to remain quiet and undisturbed for an indefinite time"; that it would greatly excite and injure her to remove her from said sanitarium," and that it would be impractical, dangerous and injurious to her to have her brought before a jury. The petition then prayed that a "writ *de lunatico inquirendo* be issued to the sheriff of Prince George's County to inquire into the lunacy of the said Eva Jackson Bliss," and that by the order of the Court her actual presence before the jury of inquisition and notice to her of the time of the sitting of said jury be dispensed with. The petition further prayed for a writ of subpoena directed against Mrs. Bliss, commanding her to be and appear in said Court on some certain day to be named therein, "and to answer the premises and abide by and perform such decree" as might be passed. The petition was sworn to by the petitioner, and there was filed with it the affidavit of Doctor Cornelius DeWeese, physician of Laurel Sanitarium,

as to the mental condition of Mrs. Bliss, and that it would greatly excite and injure her to bring her before a jury, and on the same day the Court ordered the writ *de lunatico inquirendo,* and the writ of subpoena, to issue as prayed, and further ordered that in the execution of the first mentioned writ the presence of Mrs. Bliss before the jury, "and notice to her of the time of the sitting" of the jury be dispensed with.

The inquisition was taken on the 18th of September, 1915, at Laurel, and the jury found that Mrs. Bliss was of unsound mind and not capable of the government of herself or the management of her estate, and that she was possessed of the property described in the inventory as "$50,000 30-year 4% bonds Alonzo O. Bliss properties". and "$2,000 worth of securities. All in a safe deposit box in District National Bank, Washington, D. C.—total value, $52,000." The record shows that the writ of subpoena was returned by the sheriff, "served this 18th day of September, 1915." The inquisition was confirmed on the 28th of September, 1915, and Arthur L. Bliss and Cornelius DeWeese were appointed committee of the person and estate of Mrs. Bliss. On the 23rd of March, 1916, Arthur L. Bliss and Cornelius De-Weese filed a petition to be relieved of their duties as such committee, and with it an account in which they charge themselves with three months' interest on the $50,000 4% mortgage bonds of the Alonzo O. Bliss property, amounting to $500.00, claimed credit for board, and attention at Laurel Sanitarium, costs, expenses, etc., amounting to $1,939.25, and stated that the amount of expenses in excess of income was advanced by Alonzo O. Bliss. They also filed an inventory of the estate of Mrs. Bliss consisting of $50,000 bonds of the Alonzo O. Bliss property, a policy of life insurance in the Prudential Life Insurance Company and a number of chattels, all of which were stated to be in the possession of Alonzo O. Bliss, and on the 28th of March, 1917, the Court below passed an order discharging the petitioners and appointing Alonzo O. Bliss and R. A. Bennett committee of the person and estate of Mrs. Bliss.

On the 3rd of July, 1917, Mrs. Bliss, by her mother, Sallie F. Jackson, and her sister, Vivia G. Holmes, as her next friends, filed a petition in the cause in which, after referring to the previous proceedings, including the appointment of Alonzo O. Bliss and R. A. Bennett committee of her person and estate, she alleged that at the time of the appointment of said committee she was a patient at the Laurel Sanitarium, but as her condition did not improve while there she was, with the advice and consent of her said committee, removed to the home of her sister, Vivia G. Holmes, near Wheaton, in the State of Maryland, where she still resided, and that since then she had shown marked improvement in her mental and physical condition; that for three months or more Alonzo O. Bliss had not been inclined to contribute to her proper support and maintenance and had from time to time threatened to remove her from the home of her sister. The petition further alleged that the said mother and sister of Mrs. Bliss, as her next friends, had filed a bill of complaint in the Supreme Court of the District of Columbia against Alonzo O. Bliss, in which they sought to compel him to contribute out of his own estate to her support; to have set aside a deed alleged to have been executed by her and procured by him while she was insane, and to have a proper person appointed trustee on the ground that as she was a resident of the District of Columbia, and had no property in the State of Maryland, the Circuit Court for Prince George's County had no jurisdiction to entertain the proceedings in which she was adjudged insane and Alonzo O. Bliss and R. A. Bennett were appointed committee of her person and estate, but that Alonzo O. Bliss had evaded service of process in that case. The petition then alleged that Alonzo O. Bliss, in execution of his threats, had induced R. A. Bennett to unite with him in an order directing one of the deputy sheriffs of Montgomery County to take forcible possession of Mrs. Bliss and to remove her from the house of her sister to the Springfield Hospital for the Insane, at Sykesville, in the State of Maryland;

that the deputy sheriff, accompanied by certain physicians, had attempted to execute the order by going upon the premises of Vivia G. Holmes and demanding the custody of Mrs. Bliss, but that the demand was refused because the welfare of Mrs. Bliss, "mentally and otherwise," depends upon her being taken care of in the home of friends and relations, and because to subject her to the excitement incident to her removal and association with the violent insane would impair her chances of ultimate recovery; that Alonzo O. Bliss was threatening further and other attempts to secure possession of the person of Mrs. Bliss; that as she was not a resident of the State of Maryland and had no property in that State, the Circuit Court for Prince George's County had no jurisdiction to appoint Alonzo O. Bliss and R. A. Bennett committee of her person and estate and that they were not lawfully entitled to the custody of Mrs. Bliss, and that the proceedings instituted by Alonzo O. Bliss in said Court was a fraud upon that Court and the Supreme Court of the District of Columbia. The petition prayed that Alonzo O. Bliss and R. A. Bennett be restrained "from in anywise molesting the said Eva Jackson Bliss"; that the order appointing them committee be vacated and set aside, and for further relief. The Court passed an order restraining the committee as prayed until the further order of the Court to be passed after a hearing to be had on the 10th of July, 1917.

On the 24th of July the committee filed in the Court below a petition setting out the proceedings in the case, and alleging that while Mrs. Bliss was a patient at Laurel Sanitarium some of the members of her family expressed doubt as to her mental condition, and that with the view of convincing them of her insanity, and at their request, they permitted her to be removed to the home of Vivia G. Holmes, in Montgomery County, Maryland, with the understanding that she was to remain there temporarily; that upon information that came to them from time to time they concluded that she was not receiving in the home of Mrs. Holmes the care and attention

she required, and that after consulting eminent physicians they decided that it would be to her interest to remove her to some proper institution; that accordingly they arranged to have her received as a patient at Springfield State Hospital, at Sykesville, Maryland, and gave an order to Dr. Charles C. Marbury for her removal from the home of Mrs. Holmes to that institution. The petition prayed for an order commanding Mrs. Holmes to surrender the custody of Mrs. Bliss to the petitioners. On the same day the committee answered the petition of Mrs. Bliss, by her mother and sister as her next friends, and filed a demurrer "to so such and such part of the petition" as questioned the jurisdiction of the Court and alleged that the orders thereof were procured by fraud. The Court below passed an order requiring Mrs. Holmes to show cause why the prayer of the petition of the committee should not be granted, and setting the matter for hearing on August 3rd, on which date the Court sustained the demurrer of the committee and ordered "that testimony be taken in open Court on the remaining allegations of the petition, the answer of the committee thereto, the petition of the committee and the answer of Vivia G. Holmes to said petition."

The record contains about two hundred pages of testimony taken in pursuance of the order of August 3rd, and on October 30th, 1917, the Court below passed an order dismissing the petition filed by Mrs. Bliss by Mrs. Jackson and Mrs. Holmes, as her next friends, requiring Mrs. Holmes to deliver Mrs. Bliss to her committee, and requiring the committee to place her in the Shepherd and Enoch Pratt Hospital, and to "provide for her there all necessary requirements of a person in her mental condition, including the regular and permanent care of two nurses." The order further provided that Mrs. Bliss should not be removed from said hospital without an order of the Court; directed the committee to pay for her care there out of the income from her estate in their hands, and further provided, "And in case said fund shall not be

sufficient said committee are required and directed to demand and collect from Alonzo O. Bliss, husband of Eva Jackson Bliss, the necessary and additional amount therefor."

On the 2nd of November, 1917, Mrs. Jackson and Mrs. Holmes, as next friend of Mrs. Bliss, filed an order for an appeal from the order of October 30th "as well as from the order of the Court sustaining a demurrer of the respondents to their petition," and the appellees have filed in this Court a motion to dismiss the appeal on the ground that the record was not transmitted to this Court within three months from the time the appeal was prayed, and a further motion to dismiss the appeal from the order of the Court below sustaining the demurrer to the petition of Mrs. Bliss, by her next friends, on the ground that said order was an order in the nature of a final decree, and the appeal therefrom was not entered within two months from the date thereof.

In regard to the first of these motions, it is only necessary to say that it appears from the affidavit of the clerk of the Circuit Court for Prince George's County that the transcript of the record was completed on January 1st, 1918, was paid for on the 17th of January, and was deposited in the express office on the 29th of January for delivery to the clerk of this Court. Under such circumstances the appellants cannot be held responsible for the failure of the record to reach this Court within the required time. If the delay is chargeable to anyone other than the express company, it must be attributed to the neglect of the clerk of the Court below, who held the transcript twelve days after it was completed and paid for before attempting to transmit it to this Court.

Section 26 of Article 5 of the Code authorizes an appeal from any final decree "or order in the nature of a final decree," and section 28 provides "that on an appeal from a final decree or order, all previous orders which may have been passed in the cause shall be open for revision in the Court of Appeals," unless an appeal has been previously taken under section 27, allowing appeals in certain specified

cases. In construing these sections, this Court has held that an order in the nature of a final decree, from which an appeal lies under section 26, cannot be reviewed on an appeal from a final decree under section 28 (*Peoples* v. *Ault,* 117 Md. 631), and the contention of the appellees in support of their second motion is that the order of the Court below sustaining their demurrer to the appellants' petition was an order in the nature of a final decree, from which an appeal should have been entered within two months from its date, and that it cannot therefore be reviewed under the appeal taken on November 2nd, 1917. They rely upon the case of *Hendrickson* v. *Standard Oil Company,* 126 Md. 577, where the Court upheld the right of immediate appeal from an order sustaining a demurrer to three paragraphs of a bill of complaint, each one of which alleged distinct acts of the defendant, or causes of injury, in respect to which relief by injunction was sought, and referred to sections 26 and 27 as authorizing the appeal. In the later case of *Reynolds* v. *Russler,* 128 Md. 606, the Court refused to extend the doctrine of *Hendrickson's Case* to a case in which three distinct grounds for the relief claimed were set out in the same paragraph of the bill of complaint, and the appeal was from an order sustaining a demurrer to one of them. But as the demurrer in this case was to so much of the petition as attacked the jurisdiction of the Court below on the ground that Mrs. Bliss was not a resident of, and had no property in, the State of Maryland, and as we concur in the view of the Court below upon that question, it is not necessary to determine whether the order sustaining the demurrer was one from which the appellants were bound to appeal within two months from its date.

Learned counsel for the appellants, in carefully prepared briefs, have collected and cited many cases bearing upon the question of jurisdiction in such cases, but none of them goes to the extent of holding that where the alleged lunatic is within the jurisdiction of the Court at the time the writ is

applied for and issued, the Court is without jurisdiction unless she is a resident of or has property within the State. In the case of *Fowler* v. *Poling*, 2 Barb. Ch. (N. Y.), 305, decided in 1847, where the alleged lunatic formerly resided in New York, but was at the time the commission was applied for a resident of the State of Ohio, the Chancellor said, "the Court had no jurisdiction to issue a commission unless the alleged lunatic resided here, or was the owner of property in this State. And that in case of his non-residence the fact of his owning property here must be stated in the petition." It does not appear, however, from the report of that case that Fowler was, at the time the commission was applied for, in the State of New York. *In re Devausney*, 52 N. J. Eq. 506, 28 Atl. 459, quoted by the appellants, sustains the jurisdiction of the Court of Chancery to issue a commission if the alleged lunatic is a non-resident and has property in the State. The Court stated that the duty of the care of the person and property of the lunatic, formerly imposed on the Chancellor, had been transferred by a statute of that state to a guardian appointed by the Orphans' Court of the county in which the lunatic resided, and also referred to statutes of that state providing for the care of estates of non-resident lunatics, but the Court did not decide that a Court of Chancery had no jurisdiction to issue a commission where the alleged lunatic was in the state unless he was a resident of or had property in that state.

The origin of the jurisdiction of the courts of equity of this State in such cases is stated by JUDGE McSHERRY in *Hamilton* v. *Traber*, 78 Md. 26, from which it appears that the authority to direct an inquisition to be taken did not belong to the English Court of Chancery, but was a portion of the King's executive power as *parens patriae*, and was delegated by an instrument called the "Sign Manual" to the Chancellor, as the personal representative of the Crown, to be exercised by him alone, and not by the Court of Chancery. When this special jurisdiction had been exercised by adjudg-

ing an "individual to be a lunatic and by appointing a com-
mittee of his person and property, a further jurisdiction then
arose in the Court of Chancery to supervise and control the
official conduct of the committee." 3 *Pom. Eq.,* sec. 1311.
It is said in 14 *R. C. L.* 554, sec. 4: "In this country after
the Revolution, the care and custody of persons of unsound
mind, and the possession and control of their estates, which
in England belonged to the King as a part of his prerogative,
were deemed to be vested in the people, and the courts of
equity of the various states have, either by inheritance from
the English Courts of Chancery, or by express constitutional
or statutory provisions, full and complete jurisdiction over
the persons and property of idiots and lunatics," and on
page 556, section 7, of the same volume, it is said: "In this
country as has been seen, jurisdiction over the persons and
property of the insane is exercised by the courts of equity
of the various states as the representatives of the people of
the state, and from this general jurisdiction in the absence
of statute authorizing any particular court or officer to issue
a commission of inquiry, the right to ascertain judicially
whether or not a person is of unsound mind is deemed to be
impaired." See also, *Hughes* v. *Jones,* 116 N. Y. 67, 22
N. E. 446. Section 114 of Article 16 of the Code (which
was originally enacted by the Act of 1785, Ch. 72, sec. 6),
provides: "The Court (court of equity) shall have full power
and authority, in all cases, to superintend and direct the
affairs of persons *non compos mentis,* both as to the care of
their person and the management of their estates, and may
appoint a committee, or a trustee or trustees for such per-
sons, and may make such orders and decrees respecting their
persons and estates as to the Court may seem proper." In
the exercise of this jurisdiction, the Court may entrust the
person of a lunatic to one committee and the estate to an-
other (*Rutledge* v. *Rutledge,* 118 Md. 552), and the leading
object and chief concern of the Court in the selection of the
person for the management of the estate of lunatics and the

care and custody of their persons is to advance their welfare and comfort. *Estate of Rachel Colvin,* 3 Md. Ch. 278, 285; *In the Matter of Colah,* 3 Daly (N. Y.), 529. In *Colah's Case* CHIEF JUSTICE DALY, speaking for the Court, said: "The jurisdiction assumed to be inherent in a State over that unfortunate class of persons within its limits, who are deprived of the use of their mental faculties, may be said to rest upon two grounds—First: Its duty to protect the community from the acts of those who are not under the guidance of reason, and, secondly, its duty to protect them, as a class incapable of protecting themselves, which has its foundation in the reciprocal obligations of allegiance and protection, which extends to aliens and strangers who, while they are within the limits of a State, are under the obligations of a temporary and local allegiance, and are entitled to its protection." In the case of *Gerke* v. *Colonial Tr. Co.,* 117 Md. 579, this Court, referring to lunacy cases, said: "It is a matter of frequent occurrence that proceedings of this character are set in motion by some friend or acquaintance of the lunatic, or even by a law officer of the state where no such proceeding has been started by relatives and friends, and that with which the courts are mainly concerned is not who institutes the proceedings, but whether the proceeding is for the best interest of the individual alleged to be a lunatic, and of the people among whom he lives." In *Campbell's Case,* 2 Bland, 209, CHANCELLOR BLAND, referring to a writ *de lunatico inquirendo,* said: "With regard to the county to which it must be directed; it is, in general, proper and may in some cases be indispensibly necessary, that the person alleged to be of unsound mind should be brought before the jury, who are convened by the sheriff to ascertain his intellectual condition, and for that reason the writ is almost always directed to the sheriff of the county in which the person said to be insane resides, or may at the time be placed, but if he is out of the State at the time, or it is impractical, or, as in this case, it would be attended with great inconvenience and

injury to the afflicted person, to have him brought before the jury, his actual presence may be dispensed with,. and the writ may be directed to the sheriff of the county in which he last actually resided, or in which the principal part of his estate lies. *Ex parte Southcot,* 2 Ves. 402." The judges of the Circuit Courts have, in their respective circuits, all the power, authority and jurisdiction which the Court of Chancery formerly held and exercised, except as modified by statute (Code, Art. 16, sec. 85), and as the jurisdiction of Courts of Equity to issue writs *de lunatico inquirendo* is exercised for the protection of the community, and the protection of the person and property of the alleged lunatic, there is no reason why it should be confined to cases in which the unfortunate persons are residents of or have property in the state. It is their presence within the limits of the State that necessitates the exercise of the power to protect their persons and the community in which they may be placed, and the jurisdiction of the Court does not depend upon whether they also have property within the State. *In re John Houston,* 38 Eng. Reprint, 121; *In re Princess Bariatinski,* 41 Eng. Reprint, 674; *In re Sottomaior,* L. R. Ch. Appeal Cases, Vol. 9, 677; *in re Burbidge,* 1 L. R. Ch. Div., 1902, p. 426; *In the Matter of Child,* 16 N. J. Eq. 498; *In the Matter of Neally,* 26 Howard's Practice Rep. (N. Y.), 402.

We have carefully examined the evidence in the case upon which the Court below based its order or decree of October 30th, and, apart from a further question as to the jurisdiction of the Court, to which we shall refer, we see no reason to disturb that order. As we have said, section 114 of Article 16 of the Code authorizes the Court to make such orders and decrees respecting the person and estate of a lunatic as to the Court may seem proper, and assuming that we have authority to review the action of the Court below in requiring Mrs. Bliss to be placed in the Shephard and Enoch Pratt Hospital, as to which we express no opinion, we think the evidence fully sustains the propriety of the Court's action,

and we do not understand the appellants to question it on this appeal. They suggest, however, that there was error in that part of the order requiring the expenses of her care at the hospital to be paid out of her property, on the ground that her husband is liable for such expenses. It is said in 16 *Am. & Eng. Ency. of Law* (2nd Ed.), 596: "It is the husband's primary duty to support his insane wife, and it is only when he is unable to do so that resort can be had for her maintenance to her separate estate." And in 4 *Am. & Eng. Ann. Cases,* 787, many cases to the same effect are collected. In this State it has been held that the statutes preserving to the wife the ownership and enjoyment of her property do not relieve the husband of his common law obligation to maintain his wife and to pay for medical attendance upon her and her funeral expenses. *Willis* v. *Jones,* 57 Md. 368; *Stonesifer* v. *Shriver,* 100 Md. 24. But we are not required in this case to determine whether Mrs. Bliss' husband is legally liable for her care at the Shephard and Enoch Pratt Hospital. The Court having jurisdiction of the person and estate of a lunatic must see that her proper care and comfort are provided for out of the funds under its control, leaving the question of the liability of others for the expenses incurred to be determined in some appropriate proceeding. *Estate of Colvin, supra; In the Matter of Colah, supra;* 16 *Am. & Eng. Ency. of Law* 579; *Code,* Art. 16, sec. 121.

It is further urged by the appellants that the proceedings in the Court below are void because Mrs. Bliss was not given any notice of the time and place of taking the inquisition and an opportunity to be heard. Whatever may be the rule in other jurisdictions, the necessity for such notice was determined by this Court in the case of *Royal Arcanum* v. *Nicholson,* 104 Md. 472. In that case, after reviewing the decisions in other States, JUDGE BURKE, speaking for this Court, said: "There is no statute in Maryland providing for notice to the person alleged to be *non compos,* and, therefore, the authorities we have cited have a direct bearing upon the point under consideration, and are so in consonance with the dictates of

the plainest justice that we are disposed to approve them, so
far as to declare the general rule that the party proceeded
against must be given timely notice of the proceedings, and
an opportunity to be heard." In the later case of *Packard*
v. *Ulrich,* 106 Md. 246, this Court held that the failure to
give notice to the alleged lunatic did not render the proceed-
ings absolutely void or open to collateral attack, and JUDGE
PEARCE said: "Here, there is no intervention by the alleged
lunatic, no *direct attack* upon the proceedings by *anyone* in
her behalf, or by anyone having *direct* interest in the prior
proceedings." In the case at bar, the petition was filed by
Mrs. Bliss, by her mother and sister as her next friends, and
prayed that the order appointing the committee be vacated
and set aside on the ground that the Court below had no
jurisdiction to appoint them. It is true, the petition did not
attack the jurisdiction of the Court on the ground that Mrs.
Bliss did not have notice of the proceedings, and it is sug-
gested on behalf of the appellees that under section 37 of
Article 5 of the Code the question can not be raised in this
Court. That section, however, applies only to defendants in
a suit in equity. In *Wickes* v. *Wescott,* 59 Md. 270, the
Court said: "The Code, Art. 5, sec. 27 (now sec. 37), does
not meet the case, for that section is applicable only to de-
fendants in a regular chancery proceeding, who, having been
brought in, submitted to the jurisdiction without ques-
tion, will not be permitted to question the jurisdiction on
appeal." Mrs. Bliss, by whom the petition was filed, can
not be said to be in the attitude of a defendant, who sub-
mitted without question to the jurisdiction of the Court be-
low. In *Royal Arcanum* v. *Nicholson, supra,* JUDGE BURKE
referred to the case of *Matter of Vanauken,* 10 N. J. Eq.
190, in which it was said, "in cases of confirmed and dan-
gerous madness it (an opportunity to be heard) may be dis-
pensed with, but then only by the express order of Court,"
and also to the statement in *Campbell's case, supra,* "but if
he (alleged lunatic) is out of the State at the time, or it is

impractical, or, as in this instance, it would be attended by
great inconvenience and injury to the afflicted person to have
him brought before a jury, his actual presence may be dis-
pensed with," and then said: "The person alleged to be *non
compos* must have reasonable notice of the proceedings and
opportunity afforded him to contest the truth of the allega-
tions in the petition, and must be produced before the jury,
unless the Court for sufficient reasons shown, similar to those
stated in *Campbell's case, supra,* and *Vanauken's case, supra,*
should dispense with notice and personal attendance." In
that case the question of the authority of the Court below to
dispense with notice to the lunatic under certain circum-
stances was not involved, but even if we treat the case as
decisive of that question, the rule announced in *Vanauken's
case* can not be said to apply to the case at bar. There is
nothing in the record to indicate that Mrs. Bliss' condition
was such as deprived her of the right to timely notice of the
proceedings and an opportunity to defend herself. The rule
stated in *Campbell's case* refers only to the "actual presence"
of the alleged lunatic, and makes no reference to dispensing
with notice of the proceedings. When we consider the serious
consequences that follow an adjudication of insanity, in re-
spect to both the person and property of the alleged lunatic,
and, the possibility of such proceedings being suggested by
considerations foreign to the purposes for which the jurisdic-
tion of the Court may properly be invoked, it is obvious that
persons against whom such charges are made can not, except
in the most extreme cases, if at all, be deprived of notice and
an opportunity to contest before the jury the truth of the
allegations in the petition.

The contention that the Court had no power to set aside
the order appointing the committee, because it had become
enrolled, is disposed of in *Royal Arcanum* v. *Nicholson, supra,*
and *Packard* v. *Ulrich, supra.*

The writ of subpoena which was returnable on the first
Monday of October, and which appears to have been "served"
on the 18th of September, the day the inquisition was taken,

did not give Mrs. Bliss any notice of the allegations of the petition, or of the time of the sitting of the jury. While the order of the Court below dispensed with notice to her of the time of the sitting of the "jury of inquisition," it may nevertheless be that she did in fact have timely notice of the proceedings and an opportunity to be heard, and if it so appeared by the record we would affirm the order appealed from. But as it does not so appear, we will remand the case under section 38 of Article 5 of the Code, without reversing or affirming the decree, in order that testimony may be taken to show whether Mrs. Bliss had such notice of the proceedings under the petition of Alonzo O. Bliss, filed on the 7th of September, 1915, as afforded her an opportunity to appear before the jury of inquisition and to contest the allegations of the petition. If the Court shall find that she did not have such notice, the inquisition, return and the order of confirmation thereof should be set aside, and a new jury summoned and inquisition taken.

> *Case remanded, without reversing or affirming the decree, the costs above and below to abide the final result.*