214 Md. 176 (1957)
133 A.2d 441
MATTER OF EASTON, INCOMPETENT
[No. 236, October Term, 1956.]
Court of Appeals of Maryland.
Decided June 26, 1957.
The cause was argued before BRUNE, C.J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.
Walter C. Mylander, Jr., with whom was Clayton C. Carter on the brief, for appellant.
Brief amici curiae for Maryland Title Guarantee Company, Title Guarantee Company and Real Estate Title Company, Inc., filed by Elbridge B. Donaldson, Paul J. Wilkinson, John J. Neubauer, J. Henry Ditto, Norman P. Ramsey and Charles C.W. Atwater.
PRESCOTT, J., delivered the opinion of the Court.
This is an important case. The titles to many valuable parcels of real estate in Maryland are potentially involved. It is an appeal, taken pursuant to leave of court, from a final sua sponte decree of the Circuit Court for Queen Anne's County, in equity, which dismissed a trustee's petition for a decree for a sale of his ward's real estate.
There is no question of fact involved, other than the Chancellor found, and the record fully supports such finding, that the evidence adduced showed that the reported sale would be "to the interest and advantage of the incompetent". This was necessary to comply with Code (1951) Art. 16, sec. 140 (all references to sections hereinafter made will be to Art. 16 of the same Code unless otherwise specified).
*179 The original petition was filed in March of 1954 by John H. Doyle, as the next friend of William Rex Easton. It alleged Mr. Easton was incapable of managing his property by reason of a mental disability, and prayed for the appointment of a trustee, etc. It was brought under section 135, and all of the jurisdictional requirements of that section were complied with. Although the alleged incompetent was properly summoned, he failed to appear within the period prescribed by the section. Thereafter, the Chancellor decreed that Mr. Easton was incompetent and incapable of managing his property or estate. Mr. Doyle was appointed trustee, and, after duly qualifying, thence proceeded to administer the estate. After doing so for more than two years, he, in January of 1957, sought to sell certain real estate belonging to the incompetent. He, therefore, filed a petition which contained the customary allegations, and a tentative contract of sale for the property, subject to the court's approval. No summons was requested nor issued notifying the incompetent of the proposed sale. Proof was taken, pursuant to section 140, as to the value, quantity and condition of the property and other surrounding circumstances. The Chancellor refused to ratify the sale and passed a decree which dismissed the petition. After obtaining leave of the Chancellor, the trustee entered an appeal to this Court.
Upon the above facts, we are requested to determine the following questions:
I. Is the establishment of a judicial method of determining a person to be incompetent by reason of mental disability, non compos mentis, or a lunatic, a legislative function?
II. If so, does section 135 intend to confer upon equity courts the right to adjudicate a person to be incompetent by reason of mental disability without the intervention of a jury?
III. If section 135 does intend to confer such right, is the method of inquiry therein provided for sufficient to satisfy the constitutional guarantees of:
(a) "justice and right" under Art. 19 of the Maryland *180 Declaration of Rights, and "Due Process" under the Fourteenth Amendment of the United States Constitution?
(b) trial by jury under Article V of the Maryland Declaration of Rights?

I
The first question gives us little difficulty. While it has been held in several jurisdictions that courts of equity have inherent jurisdiction over the persons and estates of lunatics, Maryland, at an early date (1827), held that whatever such inherent jurisdiction the Chancellor possessed was quite limited and it should be exercised with great care. Rebecca Owings' Case, 1 Bland 290. See also Greenwade v. Greenwade, 43 Md. 313. Neither the High Court of Chancery nor its successors, the equity courts, had inherent power to decree the sale of the property of persons non compos mentis. Hamilton v. Traber, 78 Md. 26, 31, 27 A. 229. In other words, lunacy or mental incompetency alone does not originate equitable jurisdiction over the person or estate of a lunatic, except to a limited degree; consequently, if the equity courts of this State possess such jurisdiction, its source is other than the general jurisdiction of those courts.
In order to comprehend fully that source, it may not be inappropriate to give a brief background concerning lunatics and their property. There seems no better way to do this than to quote from the opinion of this Court in Hamilton v. Traber, supra (1893), which relies for authority, in the main, upon Story, Equity Jurisprudence, sec. 1335, and Pomeroy, Equity Jurisprudence, sec. 1311:
"Lunacy or mental unsoundness did not give the English Court of Chancery jurisdiction over the person or estate of a lunatic until after an inquisition of a jury, adjudging the person to be a non compos mentis had been regularly found. The authority directing the inquisition to be taken did not pertain to that court, but was derived by delegation from the crown  it was a portion of the King's executive power as parens patriae, and did not belong to the *181 Court of Chancery by virtue of its inherent and general judicial functions. This branch of the regal authority was delegated to the Chancellor, as the personal representative of the crown, by means of an official instrument called the `sign manual,' signed by the King's own signature, and sealed with his own privy seal, and was exercised by the Chancellor alone, and not by the Court of Chancery. * * * Anciently, in point of fact, the custody of the persons and property of idiots and lunatics, or, at least of those who held lands, was not in the crown but in the lord of the fee. The Statute De Praerogativa Regis, the 17th of Edw. II, ch. 9, gave to the King the custody of idiots, and also vested in him the profits of the idiot's lands during his life. By this means the crown acquired a beneficial interest in the lands, and, as a special warrant from the crown is in all cases necessary to any grant of its interest, the separate commission which gave the Lord Chancellor jurisdiction over the persons and property of idiots may be referred to this consideration. With respect to lunatics the Statute of 17 Edw. II, ch. 10, enacted that the King should provide that their lands and tenements should be kept without waste. It conferred merely a power, which could not be considered as included within the general jurisdiction antecedently conferred on the Court of Chancery, and therefore a separate and special commission became necessary for the delegation of this new power. * * *
"The existence of this vested interest in the crown is the reason that mere lunacy did not originate the jurisdiction of the Court of Chancery over the persons and estates of idiots and lunatics, but the lunacy had first to be inquired of by a jury, and found of record in accordance with the rule of law, wherever a right of entry is alleged in the crown.
"After this special jurisdiction conferred by the `sign manual' had been exercised in any particular *182 case by adjudging an individual to be a lunatic, and by appointing a committee of his person and property, a further jurisdiction then arose in the Court of Chancery to supervise and control the official conduct of the committee. * * * The power of the committee to deal with the estate was, at common law, very limited. * * * But the jurisdiction of the Court of Chancery, acquired in the manner just stated, and after the preliminary finding of an inquisition, did not include authority to decree the sale of the lunatic's real estate for his maintenance and support until that power was distinctly conferred by Acts of Parliament passed sometime after the American Revolution. * * *
"The Maryland Court of Chancery did not, either under the Proprietary Government or after the Revolution, possess any greater or larger powers with respect to lunatics or their estates than the English Chancery was clothed with when the colonies separated from the mother country. Statutes passed after Maryland became a State extended the authority of the Chancellor; and to them, but to no inherent powers of the Chancery Court, must resort be had for the origin of the jurisdiction it may now exercise to decree a sale of a lunatic's estate for his maintenance and support."
The opinion then stated that the only authority under which the courts of equity derive their power to make sale of a lunatic's property for the purpose of effecting a change of investment was what is now section 137; and that this jurisdiction could only be invoked after his status as a lunatic had been established by an inquisition by a jury. See also Bliss v. Bliss, 133 Md. 61, 104 A. 467; Alexander's Chancery Practice, Ch. 15, Cf. 33 A.L.R. 2d 1146, par. 2. This was the law of Maryland with reference to the authority for, and the procedure to be followed in, making sales of lunatic's property for reinvestment in the year 1893; and it apparently remained the same until 1929, with possible changes that need not be related here.
*183 In 1929, the Legislature enacted what is now section 135, which made far-reaching and innovational changes in the law as outlined above. Acts of 1929, ch. 518. It is our immediate inquiry to determine whether this was a proper legislative function. Indeed, the custody of the person and property of those non compos mentis has been so generally recognized and accepted as a legislative responsibility, both in this country and in England, that it is not susceptible to serious challenge. In this country, this responsibility is subject, of course, to constitutional limitations. The Legislature of Maryland began as early as 1773 (Acts 1773, Ch. 7, November Session) to exercise this function and since then has done so many times. We have been referred to no case, and have found none, where such authority of our Legislature has been disputed. The Legislatures of our sister States have recognized and exercised these same functions, Pomeroy op. cit., supra, sec. 1313, 44 C.J.S. Insane Persons, sec. 10, and in England, Parliament has done likewise. 21 Halsbury's Laws of England, sec. 560 et seq. In this country after the Revolution, the care and custody of persons of unsound mind, and the possession and control of their estates, which in England belonged to the King as a part of his prerogative, were deemed to be vested in the people; and the people are represented by the Legislature. We have no hesitation in holding that the right to prescribe, within constitutional bounds, a judicial method of determining a person to be a lunatic or non compos mentis, and regulating the custody and control of his person and property is a proper legislative function. Bliss v. Bliss, 133 Md. 61, 71, 104 A. 467; 28 Am. Jur. Insane and Other Incompetent Persons, sec. 25.

II
Having made the above determination, we shall now consider what the Legislature intended by the enactment of section 135 in 1929 (Acts of 1943, ch. 480), and the subsequent amendment thereof in 1943. This question is one of first impression. The previous decisions of this Court relating to the procedure in regard to the determination of whether or not a person was of unsound mind stated the law as it existed at *184 the time of the respective decisions, and this is the first occasion where we consider the full meaning and effect of section 135. There was one other decision, In re Rickell's Estate, 158 Md. 654, 149 A. 446, 150 A. 25, rendered after its enactment and effectual date, but it apparently had not been published and was not called to the attention of the Court at that time. The decision in that case makes no reference to section 135. Such cases as Purdum v. Lilly, 182 Md. 612, 35 A.2d 805, dealt with petitions for writs de lunatico inquirendo.
We shall briefly recapitulate what the law was just prior to 1929. As early as 1785 by what is now section 132, the equity courts were given full power and authority to superintend and direct the affairs of persons non compos mentis, with authority to appoint a trustee for such persons and to "make such orders and decrees respecting their persons and estates as to the court may seem proper". This was then section 117 of the Code (1924). However, before this jurisdiction could be invoked by the courts, with certain exceptions named before, an inquisition by a sheriff's jury determining the person to be of unsound mind had to be returned and affirmed by the court. In 1929, the Legislature enacted what is now section 135, which, with its amendments, now reads:
"The Court shall have power also to appoint a Committee or Trustee to take charge of and manage the property of any person incompetent by reason of a mental disability, and the Court may, upon application of said Committee or Trustee, order or decree the sale of any real property or any interest therein to which said incompetent may be entitled, and the proceeds therefrom to be invested or otherwise disposed of as provided by this sub-title.

"The application therefor, may be made by next friend, shall be by petition under oath, accompanied by certificates, sworn to and subscribed by two medical doctors * * *, one of whom shall have attended the alleged incompetent within the ten days before the filing of the petition.
"Such certificate shall set out the cause, nature, extent and probable duration of the incompetency. *185 The petition shall set out the reasons for the application and the kind, quantity and value of the property to be cared for and managed. The Court shall pass an order, (a) directing the alleged incompetent to be summoned within ten days, (b) requiring that within the same time a copy of the summons, petition and order shall be left with the person with whom the alleged incompetent resides, * * *, (c) setting the petition for hearing on or after fifteen days from the date of the order, (d) and allowing an appearance and answer at any time before or after decree. The Court shall have power to revoke, modify or alter any decree hereunder at any time after appearance and answer for good cause shown.
"Such Committee or Trustee shall care for and manage the property of the incompetent and may upon proper order of the Court expend cash for the incompetent's support and maintenance, as well as for the support and maintenance of the incompetent's dependents."
The italicized portion was added by amendment in 1943, and there was one other amendment in 1933, which is not important here.
When originally enacted in 1929, the Legislature directed that it (now section 135) be known as section 117A and follow immediately after section 117 (Code 1924), mentioned above. This seems to add additional persuasiveness to the contention that the word "also" in the first sentence of section 135 indicates a legislative intent to create an alternative and additional method of determining the factum of mental incompetency. Had the Legislature intended otherwise, it is difficult to comprehend why the Legislature would have continued with rather meticulous care to prescribe how the court's intervention in such matters should be invoked and conducted. It seems that the principal portion, if not all, of the act is completely superfluous and of no effect if the Legislature merely intended thereby to give the courts the power to sell the real estate, and appoint a trustee to manage the property of an incompetent, only after an inquisition, because *186 such powers already existed. We cannot assume the Legislature intended to do a futile act.
It is a matter of common knowledge that after the passage of section 135 in 1929, many courts in this State appointed trustees for persons of unsound mind, and some of these courts ratified sales of real estate belonging to the wards. However, there were doubts in the minds of some members of the bench and bar (the same being entertained by the title companies as well) as to whether or not section 135 went so far as to authorize the sale of the incompetents' real estate. In order to remove this uncertainty and make it crystal clear that the Legislature did intend to permit sales of real property under section 135, the Legislature amended the act in 1943 and in clear, precise and certain terms, spelt out this authorization.
We hold, from the language of section 135 and other related statutes, that the Legislature intended by the enactment of section 135 to create an additional and alternative method of determining the factum of the mental capacity of those alleged to be of unsound mind; that it authorized the equity courts of this State to determine the question of mental disability without the aid of a jury; and that it permitted the sale of an incompetent's real estate for the purposes mentioned therein, upon compliance with the other provisions of law.
In making this ruling, we do not think the Legislature intended by using the words "incompetent by reason of a mental disability" to alter the standard of mental incompetency named in section 132, where the words "non compotes mentis" are used. We think the quoted words from the two sections have the same meaning. In Colegate D. Owings' Case, 1 Bland 370, 385, the Chancellor said: "Under the generic legal term, non compos mentis, is comprehended every species of mental derangement which incapacitates a man from assenting to, or making a legal contract." In Greenwade v. Greenwade, supra, 43 Md. at page 315, this Court held: "The term(s) non compos mentis used by the Code, embraces not only lunatics and idiots, but all persons of unsound mind." Again, in Purdum v. Lilly, supra, 182 Md. at page 618, this Court stated, the courts "will afford *187 protection to the person and his estate where any species of mental unsoundness is clearly shown to incapacitate him from protecting either himself or his estate against his own weakness or the artifice of others." We hold these are the standards of mental incapacity intended by the Legislature to invoke jurisdiction in the equity courts under both sections 132 and 135. This seems to be confirmed by Ch. 745 of the Acts of 1957, wherein provision is made for the appointment of a conservator for persons suffering from a "mental weakness (not amounting to unsoundness of mind)".

III

(a)
The Chancellor held that if the Legislature intended section 135 to mean what we have said above it does mean, then section 135 violates Article 19 of the Declaration of Rights and the Fourteenth Amendment to the Federal Constitution, and is therefore void. With this we are unable to agree. Said Article 19 provides that every man "for any injury done to him in his person or property ought to have remedy by the course of the Law of the Land and ought to have justice and right, * * *"; and said Fourteenth Amendment states, in part: "* * *; nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *."
This Court held in Solvuca v. Ryan & Reilly Co., 131 Md. 265, 270, 101 A. 710, that the phrase "the Law of the Land" in Article 23 of the Declaration of Rights meant the same as "due process of law" in the Federal Constitution. We hold the words "the Law of the Land" in Article 19 have a like meaning.
In the reported cases, these phrases "due process of law" and "the Law of the Land" have received many definitions. Mr. Justice Moody in the case of Twining v. New Jersey, 211 U.S. 78, uses this language:
"What is due process of law may be ascertained by an examination of those settled usages and modes of proceedings existing in the common and statute law of England before the emigration of our ancestors, and shown not to have been unsuited to their *188 civil and political condition by having been acted on by them after the settlement of this country. * * * It does not follow, however, that a procedure settled in English law at the time of the emigration, and brought to this country and practiced by our ancestors, is an essential element of due process of law. If that were so the procedure of the first half of the seventeenth century would be fastened upon the American jurisprudence like a straight jacket, only to be unloosed by constitutional amendment. * * * But, consistently with the requirements of due process, no change in ancient procedure can be made which disregards those fundamental principles, to be ascertained from time to time by judicial action, which have relation to process of law and protect the citizen in his private right, and guard him against the arbitrary action of government."
The essential elements of "due process of law" and "the Law of the Land", as they relate to a judicial proceeding, are notice and an opportunity to defend. Simon v. Craft, 182 U.S. 427, 436; In re Oliver, 333 U.S. 257, 273. Section 135, as well as section 145, makes ample provision to preserve these elements. It requires that the alleged incompetent be summoned and a copy of the "summons, petition and order shall be left with the person with whom the alleged incompetent resides". This, of course, is notice. Section 135 further requires that the petition be set "for hearing on or after fifteen days from the date of the order". This hearing, if the petition be contested, anticipates the examination of witnesses and the taking of testimony, with a full opportunity for the alleged incompetent and his witnesses to be heard and their testimony considered, and a decision by the court upon the question of his mental capacity. This affords him the right to have "his day in court", and provides the other essential element for due process of law. Simon v. Craft, supra; Chaloner v. Sherman, 242 U.S. 455.
With reference to "justice and right" under Article 19 of our Declaration of Rights, it will suffice to say, without pointing out the differences in detail, that in our opinion section *189 135 makes better provision for safeguarding the rights of an alleged incompetent and affords him more "justice and right" than the common-law procedure under a writ de lunatico inquirendo where, in many instances, there was no requirement that he be notified and the proceeding was conducted ex parte.
The Chancellor also pointed out in his opinion as one of the reasons he refused to ratify the sale, that no notice was given the incompetent that the trustee intended to sell the property. The simple answer to this is that section 137 specifically provides that such sales may be made "without any process or order of publication". The chief reason for this provision is that the trustee represents the incompetent and acts under the direction of the court. It would cause unnecessary delay and would incur useless expense to go through the procedure of summoning the incompetent and appointing a guardian ad litem for him to do substantially what the trustee has already been appointed to do. See Estate of Dorney, 59 Md. 67, 70; Cf. Packard v. Ulrich, 106 Md. 246, 67 A. 246. We have been referred to no constitutional provision, Federal or of our State, nor do we know of any, with which this portion of section 137 conflicts.
We, therefore, hold that section 135 neither violates Article 19 of our Declaration of Rights nor the Fourteenth Amendment of the Federal Constitution.

(b)
Article 5 of the Declaration of Rights provides: "That the inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that law, * * *." Our final question is to determine whether this provision preserves to those alleged to be of unsound mind the right to a jury trial. No English statute affecting jury trials in lunacy proceedings was in force in Maryland on July 4, 1776. The statute, 2 Edw. VI, Ch. 8 (1548), which provided that if the inquisition were traversed then the traverser became entitled to a jury trial, was not included in Alexander's British Statutes in force in Maryland.
There is considerable disparity in the decisions of different *190 jurisdictions as to the right to a jury trial in proceedings to adjudicate insanity or incompetency. In many, the existence of the right is denied; in others the right to a trial by jury has been asserted on the ground that the framers of the constitutions intended to perpetuate the system which forbade a finding of lunacy unless by verdict of a jury. In the main, they turn upon the interpretations placed upon the phraseology used in the individual constitutions. See annotations in 91 A.L.R. 88 and 33 A.L.R. 2d 1145; 28 Am. Jur., Insane and Other Incompetent Persons, sec. 17. We think the decided weight of authority is to the effect that lunacy proceedings are not included in constitutional requirements of a jury trial. For instance, it was held in Gaston v. Babcock, 6 Wis. 503, that such a proceeding was not a case at law, and, consequently, was not within the purview of its constitution, which stated, "the right of trial by jury shall remain inviolate, and shall extend to all cases at law". Likewise, it was held in In re Liggett, 202 P. 660, 661, that California's constitutional provision, which read, "The right of trial by jury shall be secured to all, and remain inviolate * * *", meant the common-law right of trial by jury in ordinary civil and criminal cases, and did not apply to such special proceedings as those provided for inebriates. In making a similar ruling in that State, the Court in Ex parte O'Connor, 155 P. 115, 118, used this pertinent language: "The right of trial by jury secured by the Constitution is the right to a jury trial as it existed and was recognized at common law." It will be noted that this interpretation of the California constitution closely resembles the actual wording in our constitution. That Court, at page 120, then went on to say:
"But we need not further multiply cases upon the proposition in hand. They are numerous, and, like the cases above examined, all to the effect that, where the state Constitution guarantees the common-law right of trial by jury, only those cases in which that right was habitually exercised according to the course of the common law come within the *191 terms of the guaranty, and that an inquisition of insanity is not one of those cases."
Another similar holding was made in Ward v. Booth, 197 F.2d 963 (U.S.C.A. 9th), where the constitutionality of an Hawaiian statute was assailed. This statute permitted a probate judge, after a full hearing, to adjudge an alleged incompetent to be insane, and to appoint a guardian of his person and estate without the intervention of a jury. It was contended that the procedure was violative of the Seventh Amendment, which states: "In suits at common law, * * *, the right of trial by jury shall be preserved * * *." The Court held that the statute was constitutional, and observed that it was unable to perceive any such resemblance as would require the classification of such special proceedings as "suits at common law".
We, therefore, conclude that lunacy proceedings are not such trials according to the course of the common law of England as to be included in the provision of Article 5 of the Declaration of Rights that requires jury trials. Cf. State v. Glenn, 54 Md. 572; Danner v. State, 89 Md. 220, 42 A. 965; Knee v. City Pass. Ry. Co., 87 Md. 623, 40 A. 890; State v. Loden, 117 Md. 373, 83 A. 564.
As the Chancellor found, and the record supports such finding, that the sale would be to the benefit and advantage of the incompetent, we hold that the sale should have been ratified.
Decree reversed, and case remanded for the entry of a decree in accordance with this opinion, costs to be paid from the estate of the ward.