Ex Parte in the Matter of PHILIP NORBOURNE
NICHOLAS, A Lunatic.

*Lunacy Proceedings—Notice—Collateral Attack—Laches—*
*Burden of Proof—Duties of Committee—Account-*
*ing by Trustee—Costs.*

In the execution of the writ *de lunatico inquirendo,* the per-
son alleged to be *non compos mentis* must have reasonable
notice of the proceedings and opportunity afforded to him to
contest the truth of the allegations in the petition, and must
be produced before the jury, unless the court, for sufficient
reasons shown, should dispense with notice and personal attend-
ance.                                                                      p. 607

The court having jurisdiction of the subject-matter of the
proceeding, want of notice to the person alleged to be *non
compos mentis,* or lack of opportunity to him to be present,
will render the proceeding voidable and liable to attack by the
party himself, but not void as to other parties.              p. 607

Where the alleged lunatic had been in an asylum twelve
years before the lunacy proceedings were commenced, and has
remained therein thirty-two years since the confirmation of
the inquisition and the appointment of the first committee,
the proceedings should not be quashed because it is not affirma-
tively shown that the alleged lunatic knew of the proceedings,
and that he was before the jury, or that the jury dispensed with
his presence.                                                              p. 608

It must be left in a large measure to the chancellor who
directed the writ to issue, and who confirmed the inquisition,
to determine whether there was a valid reason for not giving
the lunatic notice of the proceedings, or requiring him to be
taken before the jury.                                                    p. 608

In order to justify the court in quashing the proceedings
thirty-two years after the confirmation of the inquisition and
the appointment of the first committee, affirmative proof on
the part of the alleged lunatic is required, and the burden is on
him to establish such defects and irregularities as could invali-
date the proceedings. And such relief should be refused if the

court is satisfied that his mental condition was such that the defense of laches could fairly and properly be considered. p. 610

A petition, in the name of an alleged lunatic, and signed by him, to quash the proceedings under which he was committed to an asylum and a committee was appointed, *held,* on the evidence, to be the petition of one appointed as trustee for such alleged lunatic, and not of the alleged lunatic himself, it appearing, on the personal examination of the latter, that he had not recovered his sanity, that he did not understand the petition, and that he did not desire to leave the asylum.

pp. 610-612

It is the right and duty of the committee of a lunatic to have the court require a trustee, under a trust of which the lunatic is the beneficiary, to state a full and proper account of the matters in his hands, that it may clearly appear what the lunatic has that can be used for his benefit.       p. 614

The committee has a right to the payment to it of whatever surplus there may be in the hands of the lunatic's trustee, that the committee may be enabled more properly to provide for him and to see that those in whose care he is are properly and promptly compensated.                    p. 614

A trustee who appealed from an order and from a decree rendered in connection with a petition, by the committee of a lunatic beneficiary under the trust, asking that the trustee state an account of the trust, *held* to be liable individually to pay the costs.                    p. 614

*Decided January 19th, 1923.*

Appeal from the Circuit Court of Baltimore City (CAR-ROLL T. BOND, J.).

Petition in the name of Philip Norbourne Nicholas, seeking to quash certain proceedings by which said Nicholas was adjudged a lunatic. From a decree dismissing the petition, an appeal was taken. Affirmed.

The cause was argued, together with that next following, before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*David Ash,* for the appellant.

*S. Ralph Warnken* and *Francis B. Wiers,* for the Baltimore Trust Company, committee of Philip Norbourne Nicholas.

BOYD, C. J., delivered the opinion of the Court.

By the will of Jane Hollins Nicholas, which was probated in the Orphans' Court of Baltimore City on the 9th of February 1890, she directed a division of her estate and provided that if her son, Philip Norbonne Nicholas, be living at the time of her death, "I give, devise and bequeath one of said shares to my sons, Robert Hollins Nicholas and George Clinton Nicholas, to their heirs, executors, administrators and assigns; in trust, to receive and collect the rents and income and profits thereof and, after deducting reasonable expenses and commissions, to pay the residue to the said Philip Norbonne Nicholas." She then gave the trustees certain powers and provided for the appointment of other trustees on the death, resignation, or refusal to act of the two appointed. George C. Nicholas accepted the trust, but he was later removed, and Edwin M. Wilmer was appointed in his stead.

On February 20th, 1890, George C. Nicholas filed a petition in the Circuit Court of Baltimore City praying for a writ *de lunatico inquirendo* to inquire into the mental condition of Philip Norbourne Nicholas, who was alleged to be a lunatic, and on the same day the court ordered the writ to issue. On the 6th of March, 1890, an inquisition was returned to the court, by which it was found that Philip Norbourne Nicholas "is of unsound mind and a lunatic, without lucid intervals so that he is not capable of the government of himself or the management of his estate, and that he hath been in such state of mind for more than ten years past," etc., etc. The jury also found that said Nicholas was seised and possessed of a very large and valuable estate, real and personal. On March 7, 1890, the inquisition was confirmed and George C. Nicholas was appointed committee of the lunatic's person and property. On August 17, 1907, an order of court

was filed removing George C. Nicholas as committee, and appointing the International Trust Company of Maryland in his place. That company was later consolidated with the Baltimore Trust & Guarantee Company and did by, such consolidation, form the Baltimore Trust Company, and the latter was appointed committee.

On the 20th of June, 1919, the Baltimore Trust Company filed a petition reciting that it had been appointed committee of said Philip N. Nicholas, as successor of the International Trust Company, said estate of said lunatic being then administered under the jurisdiction of the Circuit Court of Baltimore City; that the said lunatic was and had been for a number of years confined in Mount Hope Retreat, and the revenue which petitioner collects from the estate of said lunatic was insufficient to defray the cost of board, clothing and other necessary expenses. It then prayed that Edwin M. Wilmer be required to file in that court an itemized account of the collections and disbursements made by him since his appointment as substituted trustee, and be required to distribute to petitioner the money which he now holds, after deducting the proper expenses allowed by the court. It was ordered, on the 20th of June, 1919, that Edwin M. Wilmer, substituted trustee, be required to file an itemized statement of his receipts and disbursements within ten days after service of a copy of that order on him, and that the papers in the case be promptly thereafter referred to an auditor to state an account, distributing the balance of funds in his hands to the Baltimore Trust Company, committee of Philip Norbourne Nicholas, unless cause to the contrary be shown, etc. Edwin M. Wilmer, substituted trustee, filed an answer to the ordi nisi, charging, amongst other things, that "the alleged appointment of said alleged committee, as well as all proceedings therewith connected, are null and void; that there was no due notice of said alleged lunacy proceedings served on said alleged lunatic; and that there was no due process of law in said alleged proceedings," etc. On May 11th, 1922, an-

other petition was filed, by said Wilmer, alleging many of the things in the last petition referred to, and that there is now pending in the circuit court a "bill in his behalf, entitled *Philip N. Nicholas* v. *The Baltimore Trust Company, Committee,* alleging lack of jurisdiction in said court, at the time of the decree therein in the premises." It states that he has regularly, each fiscal year, in August, filed his annual report as substituted trustee, and submitted the same to the order of the court thereon. The petition then submits "that it appears to be provident that said matter inquiring into the validity of said lunacy proceedings and the appointment of said Baltimore Trust Company and its predecessors as committees should be heard and determined before the recognition of said alleged committee, the Baltimore Trust Company, by this court," and prays for an order staying all proceedings instituted by the said alleged committee until after the aforesaid cause in the Circuit Court of Baltimore City is heard and finally determined.

The court, on the same day, passed an order dismissing that petition, and on the 16th of May, 1922, passed a decree that, within ten days after service of a copy of that order on Edwin M. Wilmer, substituted trustee, or his solicitor of record, the said Edwin M. Wilmer, substituted trustee, shall file in that cause a full, detailed, itemized report of his receipts and disbursements from the date of his appointment to that time; that when said report is filed the papers in the case be referred to one of the standing auditors of that court for the purpose of stating an account, and that in the statement of said account the auditor, after allowing the trustee such credits as are proper, shall award any balance in the hands of the trustee to the Baltimore Trust Company, committee of Philip N. Nicholas, a party defendant in the cause. An appeal was entered from the order of the 11th of May, 1922, and also from the decree of the 16th of May, 1922, concluding, "Said appeal being taken on behalf of said Edwin M. Wilmer in his several capacities of plaintiff, remainderman and trustee, and each of them."

On March 13th, 1920, a petition was filed in the name of Norbourne Nicholas, signed by David Ash as solicitor for petitioner, asking that the writ *de lunatico inquirendo,* the inquisition and the return be quashed; that an order be passed enjoining the Baltimore Trust Company, committee, from further executing the duties of committee, and doing any acts by virtue of the appointment, and compelling it to render a full account, and requiring it to show cause why the relief prayed for should not be granted. An order to show cause was passed, and the Baltimore Trust Company answered, testimony was taken orally in the presence of the court, and, on the 26th of May, 1922, a decree was passed dismissing the petition. From that decree an appeal was taken.

The proceedings to require the trustee to file itemized accounts is in Circuit Court No. 2 of Baltimore City, and the other one is in the Circuit Court for Baltimore City. The appeal from the former is No. 90, and that from the other, No. 122, of the October Term, 1922, of this Court. By agreement, the two cases were heard together and, although they are separate cases, they are so interlocked in some respects that we have concluded that it would be better to file one opinion, although the cases will have to be treated separately. We will call the case in which are the appeals from the order of May 11th, and the decree of May 16th, 1922, No. 90, and the other one No. 122. It will perhaps be more logical to consider No. 122 first, and we will do so.

## No. 122.

In the case of *Royal Arcanum* v. *Nicholson,* 104 Md. 472, Mrs. Camilla D. Nicholson, the alleged *non compos mentis,* and the Royal Arcanum, united in a petition asking to have the writ *de lunatico inquirendo,* the inquisition and the return of the writ quashed, and the order confirming the inquisition set aside, and that a new writ might issue in order that the sanity of the said Camilla D. Nicholson be lawfully inquired into. Our conclusion in that case was thus stated by

JUDGE BURKE, who delivered the opinion: "We accordingly decide that in the execution of the writ the person alleged to be *non compos* must have reasonable notice of the proceedings and opportunity afforded to him to contest the truth of the allegations in the petition, and must be produced before the jury, unless the court, for sufficient reasons shown, similar to those stated in *Campbell's* case, *supra* (2 Bland, 217) and *Van Auken's* case, *supra* (10 N. J. Eq. 190), should *dispense with notice and personal attendance.*" In *Packard* v. *Ulrich,* 106 Md. 246, although we said "we do not withdraw or qualify anything said in *Royal Arcanum* v. *Nicholson, supra,* as applicable to the case there decided," we held that it did not apply to such a case as that where the writ, appointment of the committee, etc., were collaterally attacked. JUDGE PEARCE, with his well known industry and ability, reviewed the cases cited in *Royal Arcanum* v. *Nicholson* and a number of other authorities. He quoted from *Buswell on Insanity,* sec. 56, that "the better opinion seems to be, the court having jurisdiction of the subject matter of the proceedings, that want of notice will merely have the effect to render the proceedings *voidable by the party himself,* but not void as to other parties. Nor can advantage of want of notice be taken in collateral procedings." Without quoting from the other authorities cited, it may be said that they make it perfectly clear that a proceeding without such notice to the *non compos mentis,* or his opportunity to be present, is only voidable and liable to attack by the party himself, but not void as to other parties, and the case of *Bliss* v. *Bliss,* 133 Md. 61, thoroughly sustains both of those cases, which are not in conflict, and also quotes from the *Nicholson* case what we have quoted above, which shows that the court, for sufficient reasons, similar to those stated in *Campbell's* case and *Van Auken's* case, may "dispense with notice and personal attendance." It is unnecessary to say that if the lack of notice and absence of personal attendance made the proceedings void the court could not dispense with them, and therefore the effect of

such want of notice or personal attendance must depend largely upon the circumstances in the respective cases. In *Van Auken's* case the reason given was "except in extreme cases, where such notice would be nugatory," and in *Campbell's* case the exceptions there given were, "But if he is out of the state, at the time, or it is impracticable, or as, in this instance, it would be attended with great inconvenience and injury to the afflicted person to have him brought before the jury, his actual presence may be dispensed with."

It will be observed that JUDGE BURKE in *Nicholson's* case did not confine the exceptions to the general rule to those mentioned in *Campbell's* case and *Van Auken's* case, but he said, "unless the court for sufficient reasons *similar to those*" stated in those cases, "should dispense with notice and personal attendance." As the evidence conclusively shows that this alleged lunatic had been confined in Mt. Hope Retreat since February, 1878, twelve years before the lunacy proceedings were commenced (February, 1890), and he has remained there ever since without being cured, or in a condition to be discharged, it would seem strange if the law required the court to quash all the proceedings at this late date, over forty-four years after he entered Mt. Hope, and more than thirty-two years after the inquisition was confirmed and the first committee appointed, because it was not affirmatively shown that the alleged lunatic did know of the proceedings or either that he was before the jury, or that the jury dispensed with his presence. It must be left in a large measure to the chancellor who directed the writ to issue and confirmed the inquisition, to determine whether there was a valid reason for not giving the lunatic notice of the proceedings, or requiring him to be taken before the jury. As the proceeding was begun by his brother, George C. Nicholas, twelve years after he, (Philip N.) went to Mt. Hope, during the same month that their mother's will was probated—the brother being one of those who had been named by their mother as trustees for this unfortunate one, is it not fair and reasonable

to believe that the petitioning brother did tell him of the proceedings that he was about to begin, if he was in a condition at that time to understand anything about it, or if he did not tell him, that it was because his condition was such that it might have been an injury to him to tell him or to have him taken before the jury? There is no evidence in the record that the lunatic did not have notice from his brother, or some one, that the proceedings were commenced, or were about to be, and of the time and place they were to be conducted, or that the lunatic was not before the jury, but the attorney for the appellant relies upon the fact that there is not in the return of the sheriff, or elsewhere in the papers, anything showing notice or the presence of the lunatic. It would be a dangerous rule to require a committee, especially one who, as in this instance, was appointed twenty years after the inquisition was confirmed, to prove that all reasonable requirements were originally complied with. If the one, alleged to be a lunatic, was not a lunatic, he could, and ought, within a reasonable time, be required to bring to the attention of the chancellor any such irregularities in the proceedings as existed, and were within his knowledge; and if he was in fact a lunatic and so continued to be, what possible good could be accomplished by having all the original proceedings set aside and new ones begun, as would in most cases be necessary?

Our cases cited above do not say that there must be a formal summons served on the alleged lunatic, and, as we have seen above, failure to give him notice or to have him before the jury, if he could properly be taken there, does not render the proceedings void, but only voidable at most. The reason given in *Alexander's Chancery Prac.* 225, where it was intimated that in practice notice was not given of the time and place appointed for executing the commission, was that "the proceeding is *ex parte* and not conclusive" and if notice is not given, and he was not present, it undoubtedly was "*ex parte* and not conclusive*." Yet in the forty-four years the

alleged lunatic has not himself attempted to be released, or to have the proceedings quashed. According to the docket entries in the record, on the 5th of December, 1910 (four years after the *Nicholson* case was decided), Edwin M. Wilmer, remainderman, by David Ash, his solicitor, filed a petition to quash the proceedings, which was served on the Baltimore Trust Company. There was a demurrer by the committee to that petition, which was sustained. On June 15th, 1911, there was an amended petition filed by Wilmer, which was demurred to, and on December 12th, 1911, the demurrer was sustained and the petition dismissed. Then on March 13th, 1920, this petition was filed. There was no attempt of the lunatic to have the proceedings quashed until March 13th, 1920, if that can be conceded to be his effort—thirty years after they were had.

We are, therefore, of the opinion that it would require affirmative proof on the part of the alleged lunatic to justify the court in quashing the proceedings, and the burden would be on him to establish such defects and irregularities as could, if proven, invalidate the proceedings; and even then the court could not be required to grant his petition, if it was satisfied that his mental condition was such that the defense of laches could be fairly and properly considered. Our decision in the *Nicholson* case was, of course, for the protection of those alleged to be lunatics within the meaning of the law, but if they were not so, and if one so charged is not in fact a lunatic, he should not be permitted to sit quietly by and not take steps to protect himself within a reasonable time. Unless that is done, sales may be made by the committee, titles affected, and other things might happen which demand promptness from those capable of acting.

In this case, outside of what we have been considering at length, we could have no hestitation in affirming the decree of the lower court. While the name of the lunatic is used in the petition, we cannot escape the conclusion that in reality the proceeding is by Edwin M. Wilmer and not by Mr.

Nicholas. Wilmer had him go to his office on the plea of getting his glasses fixed, and when he went there Mr. Ash, Wilmer's solicitor, was on hand and talked with Nicholas. Some time afterwards, according to Wilmer, he sent the paper filed in this case, with a letter, which is not produced, and later the paper was returned to him. According to Nicholas, the only paper he ever signed was signed at Wilmer's instance at Mt. Hope, and he does not think that the signature to the paper in evidence is his, although he is possibly mistaken about that. This is the paper spoken of: "Mr. Ash: Please act as my solicitor in the *ex parte* Philip N. Nicholas case in the Circuit Court of Baltimore City, and file such petitions or other pleadings as may be proper to establish and protect my legal rights and property in the premises. (Signed) Philip N. Nicholas."

Mr. Nicholas was put on the stand by the committee. His testimony shows conclusively that he did not understand that he was authorizing any proceedings in his name to quash the lunacy proceedings. He was asked: "At the present time you are still ill, aren't you?" and replied, "Yes," and when asked, "Do you want to leave Mt. Hope now, while you are ill?" answered: "I might better stay and see if I can get any better, but if they want to send me out there they can send me out. Q. If they want to send you out they can send you out? A. Yes, because I have no authority there. Q. What do you mean by saying you have no authority there? A. Why, I don't own the place. Q. You don't own the place? A. No, sir; they can send me out there if they want to." Then after having the paper addressed to Mr. Ash read to him, he was asked whether he understood it, and said, "Yes." When asked, "Do you say yes? A. Yes, I can see through that." This then appears in his evidence: "Q. You can see through it? A. Yes. Q. What does it mean? A. It means about what right I have, doesn't it? Q. What right you had in what? A. In any property. It might mean in any property I had. Q. What about the property? A. Any govern-

ment property.  Q. Any government property, you say ?  A.
Yes, that might mean that.  Q. That might mean that ?  A.
Yes."  He concluded by saying in reference to the paper
addressed to Mr. Ash, "I heard something read, but I didn't
understand a word of it."

Mr. Ash was produced by the committee, and was asked:
"Did he actually authorize you in any other words or state-
ments except contained in that order ?" and replied: "That is
another question.  No, sir; he did not."  The evidence shows
that this unfortunate man has not recovered, and that he was
not making any effort to get out of Mt. Hope.  This appears
about his relations to Mt. Hope: "Q. You live at Mt. Hope ?
A. I was put there.  Q. Do you like the place ?  A. What ?
Q. (Question repeated to the witness).  A. Yes.  Q. You
like the place, do you ?  A. Yes.  Q. Do you want to live
there ?  A. I never cared to leave.  Q. Never cared to leave ?
A. No.  Q. Do you like the folks out there ?  A. Yes.  (The
Court) : What did you say ?  (Witness) : I like the people
out there, I like the people in Mt. Hope.  (Mr. Warnken) :
Do they treat you nicely ?  A. Yes; they treat me grand."
He was sixty-nine years of age when he testified.  It would
not reflect much credit on a court of equity, which is supposed
to have special care over such unfortunate people, to turn him
out of Mt. Hope, after he has lived there so long, and seems
pleased with it.  If the court was compelled to quash the
lunacy proceedings it would only necessitate the renewal of
others, so he could be cared for.  Outside of the question of
this being a collateral attack, we are satisfied that the peti-
tion could not properly be granted under the circumstances,
and beyond that, it is clear that this is such an attack by
Edwin M. Wilmer in the name of the lunatic, and is in
reality a collateral attack.  It cannot be made a direct one
by his writing this paper and getting the signature of the
lunatic to it, and then employing his own attorney, who had
failed in the name of Mr. Wilmer, and now proceeding in
the name of the lunatic, who, as far as the record shows, did
not know what the proceedings meant, did not intend to have

EX PARTE NICHOLAS.                    613

Md.]              Opinion of the Court.

such proceedings in his name, and does not want done what
is sought to be accomplished, as far as we can gather from
the record.

The Baltimore Trust Company, committee as aforesaid,
claimed in its brief that the costs in No. 122 should be paid
by Mr. David Ash, individually, for reasons therein given.
We do not deem it proper to now pass on that, but the filing of
this opinion and the decree shall not prevent that company
from hereafter asserting its claim for said costs. The decree
in No. 122 will be affirmed.

## No. 90.

There can be no possible doubt about this case, especially
in view of what we have decided in No. 122. There have
been three committees appointed for Philip N. Nicholas—
the first one being appointed over thirty-two years before the
order and the decree appealed from was passed, and the Bal-
timore Trust Company was appointed on May 10, 1910—
twelve years before they were passed. It was settled in the
case of *Packard* v. *Ulrich, supra,* quoting from the syllabus
for convenience, that "An adjudication under a writ *de
lunatico inquirendo* that a certain person is insane and the
appointment of a committee of his person and property is not
open to collateral attack on the ground that the lunatic was
not summoned and did not appear at the execution of the
writ." JUDGE PEARCE quoted from *Van Fleet on Collateral
Attack,* sec. 413, where it was said: "In cases of adjudica-
tion of insanity and the appointment of a guardian, all neces-
sary prior steps are presumed. So, where the record in such a
case was silent as to service, it was presumed. In a collateral
case, the record was silent as to whether the defendant had
been produced in court, or his presence dispensed with, and
it was held that the presumption was that he was produced or
that the court dispensed with his production." This is un-
doubtedly a collateral attack, as the learned attorney appar-
ently recognized, as shown by the petition filed January 9th,
1911, and may be implied from the petition filed May 11th,

1922, which was dismissed. The Baltimore Trust Company is still acting as committee, and under our decision in No. 122, is entitled so to continue; and as Edwin M. Wilmer was substituted trustee, it was unquestionably the right and duty of the Baltimore Trust Company to have the court require Wilmer to state a full and proper account of the matters in his hands. It was certainly to the interest of the lunatic to have an account stated in the regular way, and not have to rely on what the trustee chose to put in his report. The records before us are very much abbreviated, although we make no complaint of that, but the reports that are in the record do not give such information as a trustee should give to enable the parties concerned to know the real condition of the trust. The comfort of the lunatic demands that it be clearly shown what he has that can be used for his benefit, and the payment over to the committee of whatever surplus there may be in the hands of the trustee, to enable the committee to more properly provide for him, and to see that those in whose care he is are properly and promptly compensated. Section 114 et al. of article 16 of the Code contemplate having such funds in the hands of the committee. The appellant has no valid ground for complaint of the action of the lower court, either in reference to the order of May 11th, 1922, or the decree of May 16th, 1922, and both of them will be affirmed.

The appeal from the order and the decree was taken on behalf of Edwin M. Wilmer in his several capacities of plaintiff, remainderman and trustee, and each of them, and as he had no right to be spending the money of Mr. Nicholas in such controversies and appeals, we will require him individually to pay the costs.

> *Decree in No. 122 affirmed.*
> *Order of May 11, 1922, and decree of May 16, 1922, in No. 90 affirmed and cause remanded; Edwin M. Wilmer to pay the costs, individually.*